1

2

3

4

5

6

7

United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| N.N., et al., | Case No.  20-cv-08010-VKD |
| Plaintiffs, | |
| v. | **ORDER RE IDEA APPEAL** |
| | Re: Dkt. No. 55 |
| MOUNTAIN VIEW-LOS ALTOS UNION HIGH SCHOOL DISTRICT, | |
| Defendant. | |

Plaintiffs N.N. and her mother T.T. filed this action against the Mountain View-Los Altos Union High School District ("District") seeking judicial review of an administrative decision under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.*[1] Plaintiffs contend that the District failed to identify N.N. as a student eligible for special education services in her sophomore year in high school, leading to her enrollment in an out-of-state private residential program where she attended the local public high school for her junior and senior years. Plaintiffs claim that the District denied N.N. a free appropriate public education ("FAPE") for each of the three school years at issue, 2017-2018, 2018-2019, and 2019-2020. They seek reimbursement of expenses related to her private placement and other services, as well as their attorneys' fees and costs.

An administrative law judge ("ALJ") issued a decision in favor of the District. In their present appeal, plaintiffs seek *de novo* review, arguing that the ALJ erred in several key respects.

---

[1] Plaintiffs also assert claims for violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 749, *et seq.*, and for violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12132, *et seq.*  Those claims are not before the Court on the present briefing regarding plaintiffs' IDEA appeal.

1
2
3
4

The matter is fully briefed.  Dkt. Nos. 55, 56, 59, 61.  Upon consideration of the moving and responding papers,[2] the oral arguments presented, and the record evidence,[3] the Court reverses the ALJ's decision in part and affirms it in part, and orders further briefing re plaintiffs' request for reimbursement of costs and for reasonable attorneys' fees and expenses.[4]

5

## I.    BACKGROUND

6
7
8
9
10
11
12
13
14
15
16

During the 2016-2017 school year, N.N. was enrolled as a freshman at Los Altos High School ("LAHS") within the District.  Although she appeared to transition well to high school, in May 2017, at the end of her freshman year, N.N. told T.T. that she had been struggling with depression and feelings of wanting to hurt herself.  After T.T. reached out to Galen Rosenberg, the vice principal assigned to N.N., Mr. Rosenberg notified N.N.'s teachers in a May 23, 2017 email that N.N. "has been going through a very difficult and emotional period recently.  She has reached out to her family and to us for support."  AR[5] 277.  Mr. Rosenberg further noted, "We have referred her to supports available here and outside of LAHS."  *Id.*  Around June 2017, N.N. began seeing Dr. Kapoor, a private therapist paid for by T.T. and insurance.  AR 1795:4-10, 22-25; 1796:1-2.  N.N. saw Dr. Kapoor at least once per week until around mid-May 2018.  AR 1796:5-12; 1797:5-9; 2451:25-2452:5; 2506:8-14.

17

### A.    2017-2018 School Year

18

#### 1.    N.N.'s educational experience

19
20

When she began her sophomore year (2017-2018) at LAHS, N.N. continued to struggle with symptoms of anxiety and depression.  During the first quarter, N.N.'s grades reflected her

21
22
23

[2] Both sides ask the Court to consider certain administrative decisions.  While the Court is not persuaded that judicial notice under Federal Rule of Evidence 201 is the proper mechanism for the review of those materials, the Court has considered the decisions cited by the parties.  However, the Court does not take judicial notice of any particular fact or legal conclusion in those decisions.

24
25

[3] In addition to the administrative record, the Court has also considered the testimony given during the July 16, 2021 evidentiary hearing.  *See* Dkt. Nos. 48, 57.

26

[4] All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 10, 17.

27
28

[5] "AR" refers to the administrative record plaintiffs lodged with the Court under seal.  *See* Dkt. Nos. 31, 35, 51.

United States District Court
Northern District of California

1   poor academic performance: a B+ in chemistry, a D in algebra II, a D- in AP human geography, a

2   C in Spanish and an F in an honors world literature course.  AR 482.  T.T. testified that Dr.

3   Kapoor recommended that she reach out to LAHS for assistance.  AR 1798:4-6.

4          On October 5, 2017, T.T. contacted Mr. Rosenberg for help, stating that N.N. "is feeling

5   extremely overwhelm [sic] with the transition of 9th grade to 10th grade.  She has stressed to her

6   therapist and tutor this feeling of not being able to catch up or enough time because of a lot of

7   homework."  AR 277, 1797:10-23.  Mr. Rosenberg offered to meet with T.T. to discuss N.N.'s

8   "status at Los Altos and consider what kinds of changes would be in her interest."  AR 276.  He

9   met with T.T. on October 18, 2017 and discussed ways to alleviate the stress of N.N.'s homework

10  and classes and the possibility of developing a 504 accommodations plan.[6]  AR 1798:7-24.

11         On October 26, 2017, T.T. emailed Mr. Rosenberg, attaching a note from N.N.'s

12  pediatrician, who diagnosed N.N. with anxiety and noted that "this medical diagnosis is significant

13  enough that it might require special accommodations in her educational program."  AR 275-76;

14  279; 1804:21-24.  Mr. Rosenberg was out of the office at that time; and when T.T. called the

15  school to follow up on her email, she was connected to Nicolas Betancur, LAHS's school

16  psychologist.  AR 1806:23-1807:11.  Mr. Betancur testified that he discussed special education

17  with T.T. at that time, noting that he suggested that T.T. "start with the 504 plan but to be aware

18  that special ed[ucation] support may be necessary down the road"; and that T.T. "should be in

19  touch with [Mr. Rosenberg] to first problem solve the 504 [plan] and inquire about a special

20  ed[ucation] eval[uation] if more is needed."  AR 994; 2122:22-2123:17.  Mr. Betancur did not

21  provide T.T. with a copy of the IDEA procedural safeguards.  AR 2124:14-16.

22         On November 15, 2017, the District convened a meeting and developed a 504 plan for

23  N.N.  AR 281.  Mr. Rosenberg testified that the District's normal procedure was to provide

24  _____

25  [6] A 504 plan refers to a document created pursuant to the federal anti-discrimination law
    commonly referred to as Section 504 of the Rehabilitation Act of 1973.  "While the IDEA focuses
26  on the provision of appropriate public education to children with disabilities, the Rehabilitation
    Act more broadly addresses the provision of state services to individuals with disabilities. . . . The
27  FAPE requirements in the IDEA and in Section 504 are overlapping but different."  *McIntyre v.
    Eugene School District 4J*, 976 F.3d 902, 911 (9th Cir. 2020) (internal quotations and citation
28  omitted).

parents receiving a 504 plan with documentation, including a brochure "that describes what eligibility means, what 504 plans are, what IDEA is, what special education services are." AR 1225:7-10.  T.T. received a package of information from LAHS regarding N.N.'s 504 plan, including brochures on outside services and programs.  AR 1809:1-11.  She testified that she had reviewed so many different documents at that time, she does not recall whether the package included a document with information about IDEA procedural safeguards.  AR 1809:19-23.  T.T. further testified that at that time, no one from the District explained to her that she had a right to contest the District's 504 plan or informed her that she had a right to request a special education assessment.  AR 1809:24-1810:1, 15-20.

The District's 504 plan identified N.N.'s disability as "[a]nxiety" and noted that "[a]nxiety limits learning."  AR 281.  N.N.'s 504 plan included three accommodations:  "extensions on assignments that are arranged with the teacher"; "extra time on tests up to 1.5" and the ability to "test in a separate space" with details to be arranged with each teacher; and monthly meetings between N.N. and each of her teachers.  *Id*.  Additionally, in consultation with T.T., it was agreed that N.N. would drop the honors world literature class and would enroll in a regular world literature course the following semester.  AR 968; 1056; 1232:12-16; 1815:16-22.  Mr. Rosenberg testified that at the time of the 504 plan meeting, he felt a 504 plan was appropriate for N.N. AR 1224:11-22.  Noting that N.N. is not the only student with this set of challenges, Mr. Rosenberg testified that the typical process for students diagnosed with anxiety that appeared to be affecting their schoolwork was to first create a 504 plan.  AR 1224:14-22.

N.N. ended the first semester of her sophomore year with a C- in chemistry, Ds in algebra II, AP human geography and Spanish, and no grade in the honors word literature course that was dropped.  AR 482.

During the second semester, in February 2018, N.N.'s teachers emailed one another and Mr. Betancur regarding their concerns about her academic performance.  Florence Wu, N.N.'s algebra teacher, remarked, "I have been worrying about her and her low grades thus far for 2nd semester.  Towards the end of 1st semester after we had all met, I observed that she had renewed focus and had made some marked improvement."  AR 968.  However, Ms. Wu noted that with the

start of the second semester, "[N.N.] appears to have reverted." *Id*. While Ms. Wu observed that N.N. appeared to be "happy and very social in class," she reported N.N. also was "not engaged in the lesson at all" and Ms. Wu "regularly need[ed] to ask her to pay attention and to stop being off-task with her table mates[.]" AR 999. Ms. Wu noted that N.N. asked to leave the room to get a drink of water or go to the restroom and usually returned within 5-10 minutes. *Id*. On one occasion, however, N.N. and another classmate left the room at around the same time and did not return for over 15 minutes. Ms. Wu did not know where they were during that time and told them that they were not to do that again. *Id*. Academically, Ms. Wu reported that N.N. was "essentially bombing all [of Ms. Wu's] assessments," had "not taken advantage of opportunities for corrections or retake exams," did not come to any of Ms. Wu's tutorial sessions or after-school sessions for extra help, and seemed to "hide her lack of understanding rather than face it." AR 999-1000.

Trina Mattson, N.N.'s chemistry teacher, stated that although N.N. "did fine" during the first semester, "currently she is failing, not turning many assignments in, and missing class a lot 1st period due to her appointments." AR 968. During the 2017-2018 school year, N.N. missed 28 periods of chemistry and was tardy 16 times. AR 480, 1344:9-16. Ms. Mattson understood from T.T. that N.N. was missing classes due to medical appointments. AR 1344:24-1345:3. Ms. Mattson testified that N.N.'s absences mostly impacted N.N.'s lab grades, as chemistry lab work required students to be present in class. AR 1345:13-17. Ms. Mattson did not believe that N.N.'s absences impacted her overall learning in chemistry because N.N. had generally been getting B grades on tests and quizzes. However, Ms. Mattson noted that N.N.'s performance on tests and quizzes had declined during the second semester compared to the first semester. AR 1344:17-1346:2; 1347:18-25.

Kelly Coble, N.N.'s human geography teacher, observed that N.N. "seems to be happier in class—she likes the group she sits with and seems genuinely interested in the material and class activities." AR 969. However, Ms. Coble noted that "very little (well nothing) seems to be getting done at home making it difficult for her to be successful on the tests" and stated that N.N. "hasn't taken advantage of the opportunities for corrections/resubmissions." *Id*. Ms. Coble

1   further noted that N.N. "has asked to go for a walk several times when she is stressed, which

2   shows that she is at least somewhat advocating for herself, but in terms of her overall grade, those

3   efforts aren't showing up."  *Id.*

4   Antonio Murillo, N.N.'s Spanish teacher, shared that N.N. had been leaving class for at

5   least part of the period almost daily.  He "felt that there was something emotional going on" with

6   N.N. "that at least one of her classmates was aware of."  AR 998.

7   Jasmine Mark taught the regular world literature course that N.N. enrolled in for the

8   second semester of the 2017-2018 school year.  Ms. Mark noted that, due to the relatively short

9   period of time N.N. had been in her class, it was difficult to assess her progress.  Ms. Mark

10   observed that N.N. "definitely engages with classmates" and had "a number of friends" in the

11   class.  AR 999.  For the most part, N.N. appeared to be "very focused and prepared," although Ms.

12   Mark noted that N.N. did not complete her first major assignment and did not communicate with

13   Ms. Mark about it beforehand.  *Id.*  Ms. Mark commented that "the biggest problem with

14   attendance is [N.N.] leaving class for long stretches of time to walk around/calm down[.]"

15   AR 967; 999.  Ms. Mark did not know where N.N. was going during these breaks.  On one

16   occasion, N.N. left class for over 30 minutes and seemed to understand when Ms. Mark told her

17   that was unacceptable.  AR 999; 1314:25-1315:1-14.

18   In following up on N.N.'s situation, Mr. Betancur reported to Mr. Rosenberg in February

19   2018 that "[t]here's a good explanation for the drop in grades and increased absences as of late

20   that won't be a surprise to [T.T.]."  AR 997.  Mr. Betancur later testified that he was referring to

21   mental health issues that N.N. had been experiencing.  AR 2114:10-16.  Given that N.N. had two

22   free periods at that time, Mr. Betancur told Mr. Rosenberg that he "prefer[red] to structure her

23   time a bit more . . . and have someone able to keep tabs on her," and suggested placing N.N. in a

24   supervised study class "to see what effect that has."  AR 997.  He further noted that the school

25   would then "have that information available to us in case we proceed with a formal eval[uation]

26   down the road," meaning a special education assessment.  AR 997, 2116:14-21.  The supervised

27   study class, however, was at capacity, with other students ahead of N.N. to join the class.  AR 997.

28   Mr. Betancur testified that he did not refer N.N. for a special education assessment at that time "in

United States District Court
Northern District of California

United States District Court
Northern District of California

the spirit of trying to be least restrictive as possible," and because that decision would have to be made at a team meeting rather than unilaterally by him.  AR 2116:22-2117:3.

By this time, N.N. was vaping nicotine, smoking cannabis, and drinking alcohol. AR 1465:6-11.  T.T. testified that she did not see N.N. drinking alcohol.  However, sometime between December 2017 and February 2018, T.T. observed social media posts showing N.N. vaping in class and smoking with friends in the restroom at school.  AR 1812:4-14.  She reached out to Mr. Rosenberg to bring the matter to his attention and to see what could be done to help N.N. academically because the 504 plan was not helping her.  AR 1812:18-1813:2.

On March 8, 2018, T.T. met with Mr. Rosenberg and Mr. Betancur.  T.T. informed them that she enrolled N.N. in the Children's Health Council ("CHC") intensive outpatient treatment program ("IOP").  AR 967; 1824:16-19; 2120:14-15.  Mr. Rosenberg had suggested moving N.N. to a continuation school within the District, where other LAHS students had gone to recover school credits.  AR 2119:22-25; 2122:4-8.  Mr. Betancur recalled that T.T. "seemed amenable to the idea" as a way to "reset from pressures and stress that [N.N.] was feeling at [LAHS]." AR 2120:10-14.  However, when T.T. mentioned the continuation school to N.N., N.N. did not want to be sent there because she believed that was "where they send all the bad kids" and N.N. felt she was "not a bad kid" and "just needed help."  AR 1823:17-21.  T.T. told N.N. that her options were either to go to the continuation school or to enter the CHC IOP.  N.N. chose the IOP, and T.T. followed up with Mr. Rosenberg and asked him to hold off on sending N.N. to the continuation school while they tried the IOP first.  AR 1824:2-15.

By the end of the third quarter of her sophomore year, N.N. had Fs in chemistry and Spanish, a D in AP human geography and a D- in algebra II.  AR 482.  In early March 2018, N.N. dropped her second world literature course, and received "No Mark" for that class, but her teacher Ms. Mark testified that N.N. probably would have received an F, as she had not completed a major assignment. AR 972; 1313:11-14.

### 2.    Children's Health Council Intensive Outpatient Program

On March 12, 2018, N.N. began the CHC IOP.  During the intake procedure, N.N. reported depressed mood, feelings of extreme hopelessness, and low motivation and energy.  AR 283.  She

had withdrawn from social interactions and noted a loss of pleasure in previously enjoyable activities, such as tennis and basketball. CHC noted that N.N. "was also failing academically and reported both somatic complaints and lack of interest/motivation as interfering with attending class and completing work." *Id.* Additionally, N.N. "expressed periods of extreme worry" that impacted her performance in school and outside of school and "increased her avoidance of non-preferred activities and conversations." *Id.* N.N. reported a strained relationship with T.T. and endorsed suicidal urges of moderate intensity at least three to four times per week. AR 283-84. While she had no current suicidal plan, N.N. noted that during a previous period her suicidal urges occurred four to five times per week and at times included a plan to walk in front of a train near her home. AR 283. N.N. stated that her suicidal urges increased after conflicts with her mother and during times of higher anxiety. *Id.* N.N. also reported a history of substance use, some of which was a means of coping with her symptoms of depression and anxiety. *Id.* Upon her entry in the IOP, N.N. reported cannabis use one to two times per week, as well as experimentation with nicotine, Xanax, and alcohol. *Id.*

CHC determined that N.N. met the diagnostic criteria for Major Depressive Disorder, Recurrent, Severe without psychotic features, and Generalized Anxiety Disorder. AR 284. While N.N. made some improvement in her ability and willingness to communicate with T.T., her progress in the IOP otherwise was minimal. She did not engage in the program and rarely practiced skills, tended to blame others for her problems, and had difficulty accepting responsibility for her own challenges. *Id.* Jennifer Leydecker, N.N.'s CHC therapist, observed that N.N.'s "mentality was if I just get away from my mom—I—my stress would be gone because she has these expectations for me that I don't want." AR 1428:24-1429:1.

N.N. continued to use substances outside the CHC program, and on one occasion, she came to CHC under the influence of Xanax. AR 284; 1429:5-13. She also continued to experience symptoms of anxiety and depression, and to have difficulty following rules at home and staying on task at school. AR 284. N.N. reported a desire to run away from home during conflicts with T.T. *Id.* In April 2018, N.N. left home without permission in an attempt to attend the 420 festival (a cannabis-related event) in San Francisco. T.T. and the police found N.N. using

8

United States District Court
Northern District of California

the GPS tracker on N.N.'s cell phone.  AR 284; 1826:22-1828:18.

Due to her limited progress and engagement in the program, N.N. was discharged from the IOP after about seven weeks on April 30, 2018.  AR 283-85; 1429:5-13.  CHC recommended that N.N. participate in a therapeutic wilderness program, with the possible need for subsequent residential treatment placement.  AR 285.  Ms. Leydecker testified that in terms of N.N.'s risk factors and areas for ongoing support (namely, her history of suicidality and substance use), "as N.N. moved through IOP, she had a period where she wasn't endorsing suicidal ideation.  And then once we dug deeper, it was really about the idea of not being able to leave the house and really being stuck with [T.T.]."  AR 284; 1431:15-19.  At that time, CHC did not recommend placement in a substance abuse treatment program because they felt that "the behaviors associated with [N.N.'s] . . . depression and her anxiety . . . needed to be addressed and for her to actually build really effective coping strategies and communication strategies."  AR 1432:9-17.  Ms. Leydecker believed that N.N. needed a wilderness program to gain a stronger set of skills to support all areas of functioning, including her education.  AR 1433:18-1434:14.

CHC referred T.T. to an educational consultant, who in turn referred T.T. to the Second Nature Wilderness program ("Second Nature"), as well as to a special education attorney. AR 1432:20-24; 2429:10-18.  T.T. testified that it was at this time, at the end of April 2018 or beginning of May 2018, that she learned for the first time that she had the right to request a special education assessment from the District.  AR 2428:2-9; 2429:4-7.

### 3.    T.T.'s May 1, 2018 Request for a Special Education Assessment

On May 1, 2018 at 9:26 p.m., T.T. emailed Frances English, the District's then Director of Special Education, requesting an assessment to determine whether N.N. was eligible for special education services.  T.T.'s special education attorney was copied on that email.[7]  AR 287; 2427:24-2428:12.  Ms. English responded less than 20 minutes later, stating that T.T. would "receive an assessment plan within 15 days."  AR 963.  On May 18, 2018, Ms. English sent an email to T.T. confirming that the District "mailed [N.N.]'s assessment plan this week" and

---

[7] Plaintiffs previously were represented by a different attorney than their current counsel.

1    offering to evaluate N.N. in June.  AR 963; 2432:18-22.  By May 15, 2018, however, T.T. had

2    enrolled N.N. in the Second Nature program in Utah.  On May 17, 2018, N.N. left California to

3    participate in that program.  AR 289; 295; 2434:16-23.

4         As of the end of the 2017-18 school year, N.N. received a D in algebra II, a D- in human

5    geography, and an "I" for "incomplete" in her chemistry and Spanish classes.  AR 297; 482;

6    1375:8-11.

7         **B.     Second Nature Wilderness Program**

8         Dr. Coady Schueler, N.N.'s Second Nature treating psychologist, describes Second Nature

9    as "a licensed adolescent treatment program that utilizes the experiential opportunities of a

10   wilderness setting with a clinically focused intervention."  AR 313.  At Second Nature, N.N. "took

11   part in the therapeutic milieu as well as individual and group therapy," and individual weekly

12   psychotherapy and family intervention with Dr. Schueler.  *Id*.  Dr. Schueler noted that although

13   N.N. initially presented as "angry and resentful" and experienced frequent periods of extreme

14   anxiety requiring considerable management by Dr. Schueler and program staff, N.N. "became

15   more engaged during the course of treatment" and "displayed significant progress in her ability to

16   self-regulate periods of anxiety and of emotional reactivity."  *Id*.  Additionally, Dr. Schueler noted

17   N.N.'s progress at Second Nature regarding depression, defiant behavior, substance abuse, and the

18   parent-child relationship, and reported that N.N. "enjoyed the relative stability of the wilderness

19   setting as a chance to stabilize and experience some success."  AR 314-15.  While at Second

20   Nature, N.N. earned school credits in English, biology, physical education, and psychology.[8]

21   AR 1025; 2445:25-2446:5.

22        **C.     Erica Starks's Assessment**

23        Meanwhile, the District continued to work with T.T. on an assessment plan.  AR 962-63.

24   On June 14, 2018, the District emailed to T.T. an assessment plan, along with a notice of

25   procedural safeguards and other documentation.  AR 301.  T.T. signed the assessment plan that

26   same day and returned it to the District.  AR 299; 301; 305.  Among other things, the plan

27

28   _____
     [8] The parties have not cited, and the Court has not found, evidence indicating what educational
     services, if any, N.N. received while she was at Second Nature.

United States District Court
Northern District of California

contemplated an academic achievement evaluation by an education specialist.  AR 299.

In July 2018, the District sent Erica Starks, an LAHS special education teacher and department coordinator, to Utah to conduct the academic portion of N.N.'s assessment. AR 2136:25-2137:4.  Ms. Starks has a master's degree in special education, a "mild-to-moderate" special education credential, as well as an authorization in autism and a certification in cross-cultural language academic development.  She has worked for LAHS since 2005.  Prior to her employment with LAHS, she also served as a teacher and as an education specialist/coordinator at other middle and high schools.  She testified that over the course of her career, she has conducted around 300 academic assessments.  AR  2134:1-2136:24.

Ms. Starks assessed N.N. on July 17, 2018.  AR 307.  At the time of her assessment, Ms. Starks did not know why N.N. was at the Second Nature program, but she knew that the District was considering the specific learning disability, emotional disturbance, and other health impairment eligibility categories with respect to N.N.'s assessment.  AR 2137:11-16; 2139:17-19. Ms. Starks rented a four-wheel drive Jeep and drove to the Second Nature campsite.  AR 307; 2143:4-7.  Due to the wilderness setting, Ms. Starks made modifications to standardized testing procedures.  She and N.N. worked away from the main camp group, sitting on camping chairs without a table.  AR 307.  During testing, there were three sudden thunder showers and one hail storm, each lasting about 10-15 minutes.  Ms. Starks and N.N. continued with the testing in Ms. Starks's vehicle, with Ms. Starks in the front seat and N.N. in the backseat.  *Id*.  Ms. Starks noted that N.N. "had good concentration despite the multiple distractions in the testing window."  *Id*.

Ms. Starks observed that N.N. "had an advanced level of conversational proficiency" and "appeared at ease, comfortable and self-confident compared to others her age and grade level." AR 307-08.  Ms. Starks further described N.N. as "easy going" and "exceptionally cooperative" during the examination.  AR 307.  N.N.'s activity level was noted to be "typical for her age and grade"; N.N. did not appear to be listless or overactive; and Ms. Starks reported that N.N. "was attentive and was able to concentrate on the task at hand."  *Id*.

Ms. Starks administered a set of tests from the Woodcock Johnson IV Test of

Achievement.[9]  AR 309, 2141:17-18.  She remarked that N.N.'s scores on the first two subtests for letter-word recognition and passage comprehension may be lower than her abilities.  AR 309; 2144:2-12.  Due to the unusual nature of the testing environment in a wilderness setting and the fact that N.N. had been away from academic demands for about two months, Ms. Starks noted that N.N. "was slow to warm to the testing session," but "her comfort with the testing session increased within a couple of subtests."  AR 307; 309.  By the third subtest, Ms. Starks observed that N.N. "appeared to have more focus and to be sharper."  AR 309; 2143:19-2144:13.

N.N.'s performance showed broad academic achievement in the average range.  AR 309; 311; 2147:2-11.  Ms. Starks testified that N.N.'s strengths are written expression, math calculation, math problem solving, broad written language, broad writing skills, and academic fluency (i.e., how quickly she can do something).  AR 2147:2-7.  In particular, Ms. Starks did not find N.N.'s performance indicative of a math disability.  AR 309; 2147:8-11.  N.N.'s lowest scores (in the "limited" range) were in reading comprehension; Ms. Starks also noted that N.N. said she did not enjoy reading and that it is a struggle for her.  AR 310; 311; 2147:12-15.  Ms. Starks did not believe that N.N.'s reading comprehension scores, in and of themselves, indicated a learning disability; rather those scores were "one piece" to be considered in N.N.'s assessment. AR 2147:16-22.  Ms. Starks suggested that N.N. could improve her reading comprehension through note-taking strategies.  AR 310.

### D.    Discharge from Second Nature

N.N. was discharged from Second Nature on August 1, 2018.  AR 313.  While noting that N.N. made "significant progress," Dr. Schueler nonetheless remained concerned about N.N.'s risk of relapse in depressive symptoms, defiant behavior, and substance abuse if she were to return

---

[9] Curiously, when asked on direct examination by the District's counsel whether "the Woodcock-Johnson IV [is] considered racially, culturally, or sexually discriminatory for a student like N.N.," Ms. Starks's answer was transcribed as:  "According to the publisher's, you know, pamphlets and so forth, *yes*."  AR 2142:7-11 (emphasis added).  It is unclear whether this may be a mistake in the transcription of the proceedings or whether Ms. Starks might have misunderstood or misheard the question.  However, there was no follow-up on that answer during the hearing.  And while plaintiffs challenge the sufficiency of the District's psychoeducational assessment (discussed below), no one argues that the Woodcock-Johnson IV was an inappropriate testing tool to assess N.N.

United States District Court
Northern District of California

home after leaving the program.  AR 313; 315.  For any long-term gains to be made, Dr. Schueler recommended that N.N. be placed directly "in a residential or therapeutic boarding school setting after Second Nature so that she can practice and internalize the tools she learned at Second Nature."  AR 315.  Additionally, Dr. Schueler noted that "[s]chool accommodations and a more individualized instruction plan will be important for academic success.  The school needs to be aware of [N.N.'s] previous personal challenges as they create a plan that can support weaknesses and encourage strengths."  AR 315.

### E.  Explorations Program

On August 2, 2018, the day after her discharge from Second Nature, N.N. arrived at the Explorations residential program in Montana.  AR 318.  Penny James, the program's founder and director, describes Explorations as a "private alternative adolescent residential program" and "adolescent transition home."  AR 2174:10-16; 2185:15-16.  Ms. James testified that when Explorations was founded in March 1990, there were only therapeutic boarding schools and some wilderness programs available for at-risk teens.  Explorations was intended to provide an alternative treatment facility that fell somewhere between those two options.  AR 2170:6-18.

According to Ms. James, Explorations does not specialize in the treatment of substance use disorders.  AR 2185:17-19.  While Explorations students are required to remain sober, Ms. James does not believe the program accurately is described as a "sober living home," a term which she connotes with after-care placement for a student who has had drug and alcohol treatment. AR 2185:4-11.  Although Ms. James acknowledged that Explorations may have a student who struggles with substance abuse, "that isn't the bulk of why the student is [at the program]." AR 2185:13-15.  Nor does she agree that Explorations appropriately is characterized as a "group home," a term which she believes refers to placement at a state-run home that provides more limited services for a short period of time.  AR 2185:20-2186:11.

Explorations is licensed to treat up to 12 students, with ages generally ranging from 13 to 18 years old.  AR 2175:7-10; 2176:1-4.  Students live at the Explorations facility and have a supervised study hall three to four times per week, weekly group therapy sessions, and weekly individual therapy sessions that also include family therapy/therapeutic phone calls to their

parents.  AR 2180:9-16.

Explorations is not licensed as a residential treatment center, nor is it licensed as a school. It does not have a special education teacher on its staff.  AR 2231:25-2232:5; 2233:5-13.  For their education, Explorations students attend local public schools during the week, without any Explorations staff members present.  AR 2179:16-17, 24-25.  As Ms. James testified, "by and large the kids are at school, attending the public high school, just like [any] kids might do," and much like any other student who lives in the town.  AR 2180:3-5, 2216:4-9.  Explorations serves as the primary contact for its students vis-à-vis the school and, except in certain circumstances where a parent's direct involvement is required or desired (e.g., an individual education program, a disciplinary matter, or college counseling), the school's communications, including report cards,[10] are sent directly to Explorations, which then passes communications on to parents.  AR 2217:7-10, 16-23; 2218:21-25; 2219:9-17.

Ms. James explained that Explorations does not provide a school as part of its program because its "model . . . is built around the opportunity for kids to practice in normative life things for a portion of their day.  And then be able to bring back those experiences and that learning to a therapeutic environment, where they can process it, receive support, and develop plans." AR 2239:1-8.  The purpose is to provide a program that "is inter-joined and inter-connected with real life experiences" in order to ease a student's transition back to a less restrictive setting. AR 2239:11-16.

Ms. James, who holds a bachelor's degree in secondary education and is certified as a parent coach, lives at the facility.  AR 2170:19-22; 2177:5-8.  Explorations has several full- and part-time therapists on its staff.  AR 1849:1-5; 1865:3-7.  Bruce Boudousquie is Explorations' full-time lead therapist and is a licensed clinical professional counselor in Montana.  AR 1971:8-11; 1973:2-6; 1975:19-24.  Mr. Boudousquie does not live at Explorations, but he testified that he is there about 40-60 hours per week and eats meals there.  AR 2004:23-2005:6.  Amy Henderson

---

[10] Parents are able to check their child's school grades at any time online.  *See* AR 2458:8-14; 2515:6-10.

United States District Court
Northern District of California

works as a part-time therapist at Explorations under Mr. Boudousquie's supervision.  AR 1848:11-14; 1849:1-5.  She has a bachelor's degree in elementary education and a master's degree in counseling; at the time of the administrative hearing, she was working on her licensure as a clinical professional counselor.  AR 1847:8-1848:1.  Mr. Boudousquie and Ms. Henderson provide individual and family therapy sessions and facilitate weekly group therapy meetings.  AR 1851:15-25; 1852:1-4; 1974:7-11; 1975:25-1976:15.  Although Mr. Boudousquie initially served as N.N.'s therapist during her first year at Explorations, Ms. Henderson became her therapist for the remainder of her stay at the program.  AR 1851:8-18; 1976:16-20; 1977:10-16.

Alysoun Johnston, who holds a bachelor's degree in anthropology, provides on-site academic support for all Explorations students.  AR 1856:25-1857:2; 1890:10-22.  She described that "academic support" as "providing a tutoring environment" or "study environment," as well as "academic coaching," including building weekly study plans, mandatory structured study time, and individual subject-based tutoring.  AR 1890:23-1891:8.  During N.N.'s stay at Explorations, Ms. Johnston managed the study hall and also conducted weekly one-on-one sessions with students, during which she would follow-up on each student's weekly study goals, longer term semester and school-year goals, and any areas where a student needed individual support.  AR 1892:24-1893:24; 1897:9-21; 1898:21-1901:1-22.

According to Ms. James, Explorations is not a behavior modification placement and instead aims to provide "a more realistic environment . . . for kids to internalize [behavior] change[s], and practice these changes in a more normative environment, at a more normative pace[.]"  AR 2192:20-2193:3.  To that end, students are responsible for keeping their personal area neat and clean.  They also have rotating daily chores, such as cooking or serving meals, setting the table and cleaning the bathrooms.  AR 2181:12-2182:12.  Explorations tracks a student "in a lot of the same ways that parents at home may track" their children, by looking a student's grades, study habits, and chores.  AR 2193:7-8, 10-15.  For example, Ms. James testified that they "link daily chores and daily participation in study hall to [students'] weekly allowance," such that students who do not do their daily chores do not get their daily allowance, as "[t]hat's more real life kind of thing."  AR 2193:13-17.

United States District Court
Northern District of California

1      Under a typical[11] Monday-Friday schedule, Explorations students are generally expected to

2  be ready and in the kitchen for breakfast by 6:15 a.m.  After a short morning meeting to discuss

3  the day, staff take students to the bus stop for school.  AR 2179:16-23.  As noted above,

4  Explorations students attend local public high schools like any other student, without Explorations

5  staff present.  AR 2179:24-25.  Depending on any extracurricular activities they might be involved

6  in, students return to Explorations between 4:00 p.m. and 6:00 p.m.  AR 2180:6-8.  Explorations'

7  supervised study hall is open from 4:30 p.m. to 6:30 p.m., followed by dinner; then study hall

8  reopens from 7:00 or 7:15 p.m. to 8:45 p.m.  AR 1901:19-22.  While students have different

9  activities and schedules, for the most part they are required to attend study hall from 4:30 to 6:30

10  p.m. before dinner.  AR 1901:22-1902:5.  Group therapy sessions, which are attended by all

11  Explorations students and as many staff as are available, generally are held on Wednesdays and

12  typically last around two hours.  AR 1852:13-17; 1864:4-6; 1975:1-18; 2180:10-11.  The function

13  of group therapy is to check in with the students, and weekly group topics generally relate to

14  upcoming events or issues within the Explorations household.  AR 1852:5-12; 1974:12-24.

15  Additionally, at least once per week, each student also participates in individual and family

16  therapy sessions after school.  AR 2180:11-16.

17      Friday evenings and weekends are reserved for mostly recreational pursuits.  Students can

18  wake up later, have brunch, or attend church if they wish.  AR 2180:18-2181:6.  Ms. James

19  testified that Sundays are "like it might be at your house, where everybody's kind of preparing for

20  the week."  AR 2181:7-8.

21      Like all Explorations students, N.N. was required to attend the program's supervised study

22  hall, which generally was held Monday, Tuesday and Thursday nights, and later expanded into

23  Sundays.  She also met weekly with Ms. Johnston, who as noted above, managed the study hall

24  and conducted weekly one-on-one sessions with students.  AR 1893:10-24; 1897:3-21; 1899:16-

25  1900:24; 1903:11-17.  Ms. Johnston's individual student meetings could range from 30-90

---

[11] Ms. James testified regarding a typical schedule under pre-COVID-19 pandemic conditions (AR 2179:12-14), which would apply to the majority of the period during which N.N. was at the Explorations program.

1    minutes in length and generally averaged about two hours, depending on the student's needs at the

2    time.  AR 1898:21-1899:15.  Ms. Johnston wrote weekly reports (primarily for Ms. James, Mr.

3    Boudousquie, and another staff member at Explorations) regarding each student's progress in

4    classes and in study hall.  AR 1920:11-1922:19.[12]

5          In addition to attending weekly group therapy sessions, N.N. had weekly individual and

6    family therapy sessions.  Mr. Boudousquie was N.N.'s therapist for most of her first year at

7    Explorations.  AR 1976:16-20.  He saw her on a weekly basis and also had family therapy sessions

8    with N.N. and T.T.  AR 1976:21-25.  He observed that when N.N. first came to Explorations, she

9    "was fairly positive on the outside."  AR 1988:9-10.  But as he got to know N.N., Mr.

10   Boudousquie "saw her depression," and agrees that she would not necessarily present to someone

11   as depressed unless that person spent some time with her.  AR 1988:10-11; 1990:8-10, 20-24.  He

12   testified that he believed N.N. initially was "putting on a good face" to get out of the program as

13   quickly as possible.  AR 1988:16-18.  Mr. Boudousquie testified that N.N. "had some issues" with

14   him and did not necessarily like his approach to certain things.  AR 1977:18-19.  Ms. Henderson

15   became N.N.'s therapist sometime toward the end of the summer 2019 and continued with N.N.'s

16   weekly individual and family therapy sessions.  AR 1851:11-18.

17   **F.      2018-2019 School Year**

18         On August 6, 2018, T.T. notified the District that N.N. had settled in at the Explorations

19   program.  AR 318.  With T.T.'s permission, Ms. James enrolled N.N. at Thompson Falls High

20   School ("TFHS"), a small Montana public high school.  Ms. James, with T.T.'s permission, also

21   signed releases authorizing the District to exchange information with TFHS.  The District also had

22   a release to speak with Explorations.  AR 1039; 1044; 1046; 2213:8-15; 2414:17-20.

23         Ms. James testified that Explorations is located on the border between two school districts,

24

25   [12] Ms. Johnston's weekly assessments, which she created using a particular application, were used
     to determine how much weekly allowance each student received.  Although her weekly reports
26   included a "Score" category, Ms. Johnston testified that she based her assessments on a student's
     attendance, conduct during study hall, whether the student kept up with weekly study plans, and
27   whether the student had any late work.  AR. 1921:13-19.  Thus, she testified that a "Score" of
     "0/0" on her weekly reports does not mean anything academically.  AR 1922:1-5.  It was not until
28   the following year that she began using the "Score" category to record points that could be
     translated into the amount of allowance a student received.  AR 1922:5-12.

United States District Court
Northern District of California

and pursuant to a tri-school agreement, children can choose to go to either the Noxon public schools or the Thompson Falls public schools. AR 2208:16-2209:4. Ms. James testified that she likes that she "can choose the school that fits the needs of [her] students best." AR 2209:6-7. While Explorations had begun to develop a relationship with the Noxon school district, the "high majority" of Explorations students go to TFHS, which Ms. James feels "provide[s] a better variety of educational opportunities" and where Explorations "had good success" with students who wished to take AP courses. AR 2209:3-4; 2209:14-2210:8.

### 1. Dr. Michelle Nutter's Psychoeducational Assessment

In addition to an evaluation of N.N.'s academic skills, the District's special education assessment plan called for a psychoeducational evaluation by a school psychologist in a number of areas, including health, intellectual development and social/emotional behavior. AR 299. The District hired school psychologist Michelle Nutter, Ph.D. to conduct N.N.'s psychoeducational evaluation to determine whether she qualified for special education services. AR 1506:15-21; *see also* AR 1488:20-21. Dr. Nutter has a bachelor's degree in Liberal Studies, a master's degree in special education, and a Ph.D. in educational policy and management as a school psychologist. AR 1030-31; 1486:4-1488:14. She works for the San Ramon Valley Unified School District as a school psychologist. AR 1488:19-20. Although the District has its own school psychologist, Dr. Nutter testified that she is brought in on "more complicated" cases, namely, matters involving students with social-emotional or behavioral issues. AR 1496:22-1497:14.

Dr. Nutter traveled to Montana and assessed N.N. at Explorations on August 24 and 25, 2018. AR 337; 1510:24-1511:12. Dr. Nutter also reviewed available records;[13] spoke with Ms. Starks and considered Ms. Starks's July 2018 academic assessment of N.N.; interviewed Mr. Rosenberg, Ms. James and Rich Ferris, TFHS's principal; interviewed and received information from T.T.; spoke with Dr. Schueler; and also spoke briefly with Dr. Anna Parnes, a CHC clinician. AR 337-358; 1511:17-23; 1513:14-1515:1; 1662:11-19; 1663:16-24. Dr. Nutter did not observe

---

[13] Dr. Nutter testified that her records review was concentrated through N.N.'s middle school years because N.N.'s cumulative record was on the way to TFHS at the time of the evaluation. AR 1663:16-24. Dr. Nutter did review full transcripts. *Id.*

N.N. in a classroom setting because school was not yet in session at the time of her evaluation. AR 1662:15-16.

Dr. Nutter concluded that N.N. was not eligible for special education services.  AR 337-358.  In summarizing her findings, Dr. Nutter observed that "N.N. is a capable teenager," with "intellectual and cognitive abilities [that] fall mostly within the average to high average range," as well as "strong" "perceptual/fluid reasoning, visual processing, oral expression, and long term storage and retrieval" abilities.  AR 350.  Dr. Nutter further noted that when she pays attention, N.N.'s receptive and auditory reasoning skills are "well developed" and that "[a]cademically, writing emerged as an area of strength."  *Id.*

Dr. Nutter also noted several areas of concern.  With respect to higher level attention, Dr. Nutter found that N.N. "has the capacity to focus" and that "[h]er working memory skills fall within age level expectations."  *Id.*  "However, variability was noted on tasks that placed greater demands on sustained visual and auditory attention, sustained effortful processing, and multi-tasking."  *Id.*  Dr. Nutter also reported "some mild weakness in the area of executive functioning: synthesizing details, cognitive flexibility, and self-monitoring/metacognition," that can cause N.N. to "become overwhelmed and shut-down/disengage from class work."  *Id.*

As for N.N.'s social/emotional functioning, Dr. Nutter noted the CHC's diagnoses of Major Depressive Disorder, Recurrent, Severe without psychotic features, and Generalized Anxiety Disorder and remarked that "test findings indicated that [N.N.] has a history of experiencing a great deal of depression and anxiety relative to other teenagers," as well as "a great deal of anger and sadness toward her mother, which has manifested, over time, in poor social choices and feelings of sadness and depression."  AR 340; 350; 351.  In reviewing N.N.'s social and academic history, Dr. Nutter noted that N.N. "was enrolled in several schools within the city of Los Altos, CA before transitioning to high school, which was a source of stress and angst for [N.N.]" and "a source of conflict between [N.N.] and her mother."  AR 338.  Additionally, Dr. Nutter discussed "a great deal of familial stress," with N.N. reporting "that her mother does not understand her and has been the source of many of the stressors in her life, most notably the decline in her relationship with her aunt," whom N.N. regarded as a "mother figure."  AR 351; *see*

*also* AR 338; 1519:3-23; 1520:17-1521:1.  Dr. Nutter also noted that T.T.'s responses on rating scales endorsed significant concern with respect to N.N.'s mood and behavior and placed N.N. in the at-risk range for conduct issues, anxiety, depression and withdrawal.  AR 350; 1513:14-17.

During her assessment of N.N., Dr. Nutter administered certain rating scales and reported that N.N.'s responses on the Behavior Assessment System for Children—Third Edition ("BASC-3") rating scales "reflect significant levels of depression, withdrawal, and negativity toward school and parents."  AR 351; 1596:18-25.  However, Dr. Nutter testified that during testing, N.N. stated that she answered the BASC-3 questions retrospectively, as if she were still living at home in Los Altos.  AR 1596:11-12, 18-25; 1598:25-1599:5, 14-16.  Dr. Nutter reported that testing revealed that N.N. "finds her life in Los Altos to be depressing and a source of anxiety, in large part because of how she feels at home which spills over to apathy at school."  AR 351.

By contrast, Dr. Nutter noted that N.N.'s responses on the Children's Depression Inventory ("CDI") rating scales were "more real time" and based on N.N.'s "current state at that time."  AR 1596:13, 16-18.  Those CDI responses, according to Dr. Nutter, indicated that N.N. did "not appear to feel the same level of emotional distress at Explorations or [TFHS]" and "did not reflect significant level of depression or sadness."  AR 351; 1596:16-18.  Indeed, Dr. Nutter stated that "[r]eports from staff at Explorations as well as from [TFHS], indicate that [N.N.] is an interactive and compliant teenager."  AR 351.  In particular, Dr. Nutter noted that while Ms. James reported that N.N. could "engage in typical teen 'snarkiness'" and tended toward negative thinking, N.N. was not so negative that it impacted her relationship with others.  AR 341; 352.  According to Dr. Nutter, Ms. James also reported that N.N. made progress behaviorally and emotionally, consistently performed her chores well and on time, and was "beginning to hold good boundaries with people" and to make friends.  AR 341.  Additionally, Dr. Nutter noted that TFHS principal, Rich Ferris, reported in September 2018 that N.N. had "acclimated well socially as well as academically," was participating in cross-country sports, and was "completing assigned work without any accommodations or instructional support," with grades in the A and B range.  AR 339.  He further noted that N.N. is "very social, outgoing and liked by her peers," and that he had no concerns about N.N. "academically, behaviorally, or emotionally at this time."  AR 339;

341.

Ultimately, Dr. Nutter concluded that N.N. was not eligible for special education services under the three eligibility criteria of emotional disturbance, other health impairment, and specific learning disability.[14] With respect to emotional disturbance, while Dr. Nutter acknowledged that N.N. "has a history of experiencing a general pervasive mood of unhappiness or depression," Dr. Nutter also noted "a change in [N.N.'s] mood" after the end of May 2018; that N.N. did not present at TFHS "as sad to a marked degree"; and that N.N. "demonstrated the ability to access the core curriculum  at [TFHS] . . . [and] is attending class and completing work without any accommodations or intervention support."  AR 352; *see also* AR 1608:1-1609:4.  Similarly, with respect to the criteria for other health impairment, Dr. Nutter noted N.N.'s diagnosis of Major Depressive Disorder and Anxiety, as well as attention issues, but concluded that "at this time, [N.N.] is demonstrating the ability to access core instruction, in spite of the above profile, without accommodations or interventions."  AR 352; *see also* AR 1611:9-1612:2.  As for the criteria for a specific learning disability, Dr. Nutter found that despite "a processing disorder in the area of attention" and "a relative weakness in the area of reading," N.N.'s performance at TFHS indicated that she "is accessing the core curriculum, without any additional supports."  AR 353.

With respect to services N.N. was receiving at Explorations at the time of her assessment, Dr. Nutter testified that she was aware that N.N. was receiving therapy at Explorations, but was not aware that N.N. had a treating therapist there or that any academic support was being provided, beyond the proctoring of final exams in chemistry and Spanish that N.N. had missed at the end of the 2017-18 school year at LAHS.  AR 1543:9-18; 1612:9-22; 1645:21-25; 1756:5-11. Dr. Nutter also testified that she was not aware that N.N. was receiving any direct instruction to support executive functioning skills, such as organizing her work, keeping track of assignments, or breaking down long-term assignments over time.  She acknowledged that Ms. James discussed "some of the structures in place," including the "schedule of chores that [students] were to

---

[14] Although Dr. Nutter's report states that N.N. "<u>requires</u> special education to receive benefit from the general education program" (AR 352), Dr. Nutter testified that she only meant to state what N.N. needs to demonstrate in order to be found eligible for special education, and did not intend to suggest or conclude that N.N. requires special education services.  AR 1606:17-1607:8.

United States District Court
Northern District of California

follow," which Dr. Nutter agreed could help with executive functioning deficits.  AR 1543:19-1544:9; 1612:23-1613:18.  However, Dr. Nutter testified that she understood Ms. James to be describing, not particular services, but features that were "just inherent in the program." AR 1613:11-12.  Dr. Nutter did not consider services N.N. received at Explorations to be special education services.  AR 1616:20-1617:2.

## 2.   September 18, 2018 Individual Education Program Meeting

On September 18, 2018, the District convened an individual education program ("IEP")[15] meeting, which was attended by T.T., Ms. Starks, Ms. Mark, Dr. Nutter, and Kristen Hardy, who began working as the District's new Director of Special Education in mid-July 2018.  AR 365; *see also* AR 2251:17-25.  The District's special education assessment was reviewed, and Ms. Starks and Dr. Nutter reported their findings.  AR 360-69.  According to the notes of the IEP meeting, "Ms. Hardy explained that the purpose of this evaluation is to identify if [N.N.] requires special education and related services in order to access her education," meaning "specialized academic instruction" ("SAI"), and that it was "beyond the scope of the current evaluation to consider other medical and environmental factors that may be very beneficial to consider in supporting [N.N.] and her return home."  AR 367.  Additionally, the IEP notes state that the IEP "team discussed what SAI looks like" and that T.T. "agreed that [N.N.] did not require SAI."  *Id*.  The District concluded that N.N. was not eligible for special education and related services.  AR 361; 366.

T.T. signed the IEP document as "to attendance only," noting that she did "not consent to anything."  AR 368.  She testified that she disagreed with the District's conclusion that N.N. was not eligible for special education services.  AR 2461:14-2462:2.

In December 2018, T.T. filed a formal due process complaint against the District, which was withdrawn in January 2019.  *See* AR 125; 2366:15-18; 2367:2-3; 10-13, 2368:7-12; 2462:17-

---

[15] An "IEP" refers to "a written statement for each child with a disability" that outlines "the child's present levels of academic achievement and functional performance," states "measurable annual goas, including academic and functional goals," describes "the child's progress toward meeting the annual goals," and outlines the child's educational plan, including "the special education and related services and supplementary aids and services" to be provided to the child.  *See* 20 U.S.C. § 1414(d)(1)(A).

United States District Court
Northern District of California

24.

### 3.    Dr. Nicole Medina's Psychological Evaluation

In February 2019, T.T. obtained a private psychological assessment by clinical psychologist Nicole (Shewey) Medina, Psy.D.[16]  AR 434-59.  Dr. Medina, who holds a clinical psychologist license in Utah, evaluated N.N. on February 4, 2019 and noted that the purpose of her assessment was "to provide a more detailed conceptualization of her strengths, weaknesses, and psychological functioning."  AR 435.  Dr. Medina gathered information based on a clinical interview of N.N., a review of available records, and interviews with T.T. and Mr. Boudousquie, who was N.N.'s therapist at Explorations at that time.  AR 437.

Dr. Medina found no deficits in N.N.'s cognitive abilities and found that her overall academic skills were in the average range; but she noted difficulties in math computation and reading comprehension, as well as memory issues.  AR 445; 447.  Dr. Medina posited that N.N. likely has an avoidant attachment style, stemming from familial difficulties including her parents' divorce when she was a toddler, a strained relationship with T.T., and decreased closeness with her aunt, whom N.N. referred to as her "real mom."  AR 452.  With respect to N.N.'s emotional functioning, Dr. Medina stated that N.N. reported drug and alcohol use to mask feelings of sadness and emotional pain.  While Dr. Medina noted N.N.'s history of suicidal ideation, she reported that N.N. did not currently endorse such symptoms or symptoms indicating a more severe depressive disorder.  AR 453.  Using criteria from the Diagnostic and Statistical Manual of Mental Disorders ("DSM-5"), Dr. Medina diagnosed N.N. with Attention Deficit Hyperactivity Disorder ("ADHD"), Combined Presentation; Persistent Depressive Disorder (Dysthmia); Specific Learning Disorder with Impairment in Mathematics; Alcohol Use Disorder; Cannabis Use Disorder; and Parent-Child Relational Problem, with a need to rule out Mixed Expressive-Receptive Language Disorder or Language Processing Disorder.  AR 454.

Dr. Medina opined that N.N. "currently requires a structured environment that will hold her accountable, assist her in treatment buy in, and offer substantial assistance with academics."

---

[16] Although Dr. Medina is referred to variously in the record as Nicole Shewey and Nicole Medina, for convenience the Court will refer to her as Dr. Medina.

AR 453.  If N.N. were to return home "without completing necessary family and individual therapy work," Dr. Medina stated that N.N. was likely to relapse in her drug and alcohol use and poor academic performance.  *Id*.  Dr. Medina recommended that N.N. not "return to public school, or any less restrictive environment, given her attitude toward therapy and propensity for relapse."  AR 454.

Although Dr. Medina's report indicates that she interviewed Mr. Boudousquie, there is no mention in the report whether Dr. Medina was aware that at the time of her assessment that N.N. was attending TFHS.  Additionally, Ms. Hardy testified that Dr. Medina did not contact LAHS for any information.  AR 2368:13-2369:1.

Dr. Medina did not testify at the administrative hearing.

### 4.    N.N.'s Progress at TFHS and Explorations

As noted above, in September 2018, TFHS principal Rich Ferris reported to Dr. Nutter that N.N. had transitioned well as a student at the school, had "acclimated well socially as well as academically," was participating in cross-country sports, and was "completing assigned work without any accommodations or instructional support," with grades in the A and B range.  AR 339.  He further noted that N.N. is "very social, outgoing and liked by her peers," and that he had no concerns about N.N. "academically, behaviorally, or emotionally at this time."  AR 339; 341.

The record also contains a document entitled "Section 504 Accommodations for [N.N.] 2018-2019 School Year" at TFHS.  AR 371.  Noting that N.N. had been identified for a 504 plan the previous school year at LAHS under the criteria for anxiety, TFHS implemented a similar 504 plan for N.N., with the following accommodations:  "[e]xtended time on assignments as decided in conjunction with the teacher"; "[e]xtended time, up to 1.5 on tests with the option to test in a less disruptive environment"; monthly meetings between N.N. and each of her teachers; and "[n]o accommodations in elective classes."  *Id*.  This plan was signed by Mr. Ferris, Ms. James and N.N. on October 5, 2018.  *Id*.  Ms. James testified that she signed the 504 plan, and that in doing so, she agreed that the plan was appropriate, at least based on her limited view of N.N. six weeks into the Explorations program.  AR 2228:6-23; 2241:2-15.

United States District Court
Northern District of California

In terms of N.N.'s therapy at Explorations, Mr. Boudousquie testified that treatment goals focused on N.N.'s depression and anger, her interaction with peers, and her family relationships, including with her parents and her aunt.  AR 1977:3-9; 1991:17-1992:5.  N.N. did not present as suicidal at that time, although she would talk about wanting to be back in California because she missed her friends.  AR 1991:2-5, 11-16.  Over the course of the year, N.N. reported enjoying school because of the friends she was making there, although she did not necessarily like the academic aspect of school generally.  AR 1992:21-1993:1.  Mr. Boudousquie talked with N.N. about "staying focused because there's times when she'd get sidetracked thinking about the socializing and such versus the actual school work and academics."  AR 1993:19-22.  He would also encourage N.N. to talk with her teachers if she had an issue with them and to use Ms. Johnston as a resource.  AR 1993:16-19.  However, Mr. Boudousquie did not recall how N.N. was performing in school at that time and testified that students generally talk to him about how they feel about school, and not how they are performing academically.  AR 1993:4-9.  Academic matters generally were addressed by Ms. James or Ms. Johnston.  AR 2007:5-17; 2007:25-2008:1. In general, Mr. Boudousquie did not communicate with TFHS about Explorations students, except on occasion if a TFHS counselor would call Ms. James or Ms. Johnston about an emotional or behavioral issue that they felt warranted discussion with him.  AR 2007:12-17.  With respect to N.N., Mr. Boudousquie did not talk with TFHS about her, and he could not recall whether TFHS ever called him to discuss N.N.'s mood at school.  AR 2006:23-2007:4.

N.N. regularly attended Explorations study hall and was generally present for individual weekly meetings with Ms. Johnston.  Ms. Johnston testified that if N.N. was absent, it usually was due to extracurricular school activities or illness.  AR 1903:11-17; 1906:16-1907:2.  For those times when N.N. missed study hall, Ms. Johnston stated that as early as Spring 2019, N.N. had demonstrated that she was responsible enough to earn a "time card," meaning that N.N. could independently track and record the time she spent studying to count toward her study hall hours. AR 1904:18-1905:10; *see also* AR 416, 418.

During the first semester of N.N.'s junior year at TFHS, Ms. Johnston noted in October 2018 that N.N. maintained fairly good grades, consistently attended study hall, updated her study

United States District Court
Northern District of California

1   planner, and showed good task initiation when under pressure.  AR 404.  However, Ms. Johnston

2   observed that N.N. was also easily distracted and did not use her time wisely.  AR 401; 404.  By

3   November 2018, N.N. was accruing a larger number of missing assignments and getting Cs or Ds

4   in classes where she previously had Bs.  AR 401; 402; 1910:1-8.  In mid-November 2018, Ms.

5   Johnston reported that N.N. showed "an improved attitude in study hall and focus on her work,"

6   and had asked for more time on testing and writing assignments per her 504 plan.  AR 399-404.

7   By the end of November 2018, N.N. still had nine missing assignments and was following only

8   25% of her study plan.  AR 399.  Ms. Johnston believed that N.N.'s academic performance was

9   impacted, at least in part, by a negative self-image and that N.N. "worked to confirm that to

10   herself by . . . not putting that much effort into her grades[.]"  AR 1928:13-18.  Ms. Johnston

11   testified that her work with N.N. during her junior year involved building a "can-do attitude,"

12   creating study skills, developing an organized approach to her course work, advocating for herself,

13   and being more respectful in her interactions with adults.  AR 1925:22-1926:3, 17-23.

14        In January 2019, early in the second semester of N.N.'s junior year, Ms. Johnston felt that

15   N.N. experienced a turning point after suffering a concussion and seemed "to really start doing her

16   work more intentionally than she had been doing" and recognized that she could earn good grades

17   if she made the effort.  AR 1928:23-1929:9.  Thereafter, Ms. Johnston observed an overall

18   improvement in N.N.'s grades and relationships with teachers.  AR 1929:15-1930:18.  Ms.

19   Johnston's weekly reports during this period show that while N.N.'s grades fluctuated, she

20   generally maintained As and Bs in her courses, though her English grades fell at times due to

21   missing assignments.  AR 405-420.  A TFHS fourth quarter report card of mid-term grades shows

22   that N.N. received As in English II, chemistry, computer apps and college prep courses; a B in

23   algebra II; a D- in English III (with a notation indicating that N.N. had missing work); and a D- in

24   U.S. history.  AR 463.  However, by the end of her junior year, N.N.'s transcript appears to show

25   that she earned mostly As and Bs (with a C- in a yearbook class), and had a grade point average of

26   3.385.  AR 1052.

27        In her June 14, 2019 year-end summary report, Ms. Johnston noted that N.N.'s strengths

28   were "Math, writing (expression & structure), organization, concrete sequential and critical

thinking skills." AR 474.  Her weaknesses included "Reading (very avoidant), writing (syntax, voice, mechanics & citations, vocabulary & efficiency), and abstract thought."  *Id.*  Additionally, Ms. Johnston noted that N.N. tended to become overwhelmed by work and did not follow through on studying for standardized tests.  *Id.*  Ms. Johnston further observed that while N.N. was resistant to studying Spanish at the beginning of the year, she "improved her efforts significantly from the first to the second semester, earning a notable 3.871 G.P.A. in the third quarter, and very high scores on several final exams."  *Id.*  Additionally, Ms. Johnston noted that N.N. "did well" balancing responsibilities for her new service dog with her daily assignments.  *Id.*  In all, Ms. Johnston stated that N.N. "successfully completed 11th grade for the 2018-2019 academic year." *Id.*

Ms. Johnston recommended a reading program to "increase[] literacy and encourage[e] readership."  *Id.*  For N.N.'s senior year, Ms. Johnston further recommended an academic plan that included "reading and writing practice" and "test prep."  *Id.*  Additionally, Ms. Johnston suggested a speech pathologist's evaluation of N.N.'s reading skills, and said she normally recommends such an evaluation for any student who demonstrates a reluctance to read.  AR 474; 2037:13-18.  Ms. Johnston is not aware that N.N. was evaluated by a speech pathologist, and she did not follow up on that issue, as that was "more of a therapeutic process . . . outside of [her] purview." AR 2040:3-6.

### 5.     The May 16, 2019 Individual Education Program Meeting

Meanwhile, T.T. provided the District with Dr. Medina's report of her psychological evaluation of N.N.  On May 16, 2019, the District convened a second IEP meeting to review that report.  AR 465-72.  The meeting was attended by T.T., Ms. Hardy, Ms. Starks, Dr. Nutter (who participated via telephone), Tim Farrell (an LAHS general education teacher), and Beverly Tom (a District Assistant Director of Special Education).  AR 468.

Dr. Nutter reviewed Dr. Medina's report and noted several areas of agreement between her assessment and Dr. Medina's evaluation.[17]  In particular, both assessments appeared to agree

---

[17] The IEP meeting notes indicate that Dr. Nutter provided an amended version of her own report in which she converted scores to standard scores "for ease of comparison" with Dr. Medina's

United States District Court
Northern District of California

1  regarding N.N.'s angst and her feelings toward T.T. and her early life experiences; N.N.'s feelings

2  of stress around the time she transitioned from elementary school to middle school; and N.N.'s

3  reports of using drugs and alcohol and the reasons why.  *Id*.  Dr. Nutter also noted several areas of

4  disagreement with Dr. Medina's assessment, including Dr. Medina's conclusion that math was an

5  area of need.  The IEP meeting notes further state that while reading comprehension is an area of

6  weakness, N.N.'s grades did not demonstrate that accommodations or remediation was required at

7  school in order for N.N. to access the curriculum.  *Id*.  Dr. Nutter's biggest concern was that Dr.

8  Medina's assessment lacked any school-based context, which Dr. Nutter felt was necessary to

9  address special education eligibility criteria.  AR 469; 1642:12-14, 17; 1643:3-11, 19-23.

10  T.T. noted that at the "group home," N.N. "receive[d] therapy" and "works with [a]

11  tutor[.]"  AR 470.  As Explorations is the only "group home" in the record, T.T. presumably was

12  referring to services N.N. received at Explorations.  Other than her 504 plan and the support she

13  received from Ms. Johnston, there is no evidence that N.N. received any assistance relating to her

14  education during her stay at Explorations and attendance at TFHS.  According to the IEP meeting

15  minutes, T.T. expressed that "the home environment has been instrumental in the progress that

16  [N.N.] has made[.]"  *Id*.  Additionally, T.T. noted that N.N. also received support from a service

17  dog and ADHD medications.  *Id*.

18  Mr. Farrell shared information received from TFHS, including that N.N.'s teachers

19  reported that she "experienced a minor stumble due to turning in a paper late," but was "attentive,"

20  "comfortable," "doing well," and rarely accessed her 504 plan accommodations, "with the

21  exception of extra time to turn in long-term written assignments."  AR 469.  Mr. Farrell noted no

22  reports of reading comprehension challenges.  *Id*.  While Dr. Nutter reflected that N.N.'s writing

23  difficulties may be due to executive functioning challenges, N.N.'s English teacher reported that

24  other than additional time for written assignments, N.N. required no other accommodations.  *Id*.

25  Additionally, Mr. Farrell noted that N.N.'s algebra teacher reported that N.N. generally grasped

26

27  _____

28  report and which Dr. Nutter stated was "typical professional practice."  AR 469.  Dr. Nutter
testified that she did not recall making any substantive changes from her original report.
AR 1647:2-6.

United States District Court
Northern District of California

concepts and currently had a B in that class, and that there was no reference in reports from TFHS that N.N. required re-teaching or additional assistance in learning concepts.  *Id.*  In her past three quarters at TFHS, N.N. earned an overall grade point average of 3.151, 3.051 and 3.871.  *Id.*

The District concluded that N.N. "continues not to be eligible for special education and related services," because N.N. did not demonstrate that she needs special education services and because "the accommodations she is receiving through a 504 [plan] is all that she requires."  AR 470.

### G.     2019-2020 School Year

As noted above, around the end of the summer in 2019, Ms. Henderson became N.N.'s therapist at Explorations and continued with N.N.'s weekly individual and family therapy sessions.  AR 1851:8-18.  Ms. Henderson testified that N.N.'s treatment goals included self-advocacy; developing skills to manage depression and anxiety; managing her approach and interaction with peers; frustration tolerance; post-high school plans; and developing skills to plan and work toward goals in an efficient and effective manner.  AR 1853:9-1854:9.

Ms. Henderson testified that she spoke with Ms. Johnston, whom she identified as Explorations' "on-site academics support" for students, about how to best approach any of N.N.'s needs for support in school.  However, Ms. Henderson did not speak with Ms. Johnston on a regular basis; rather, Ms. Henderson spoke with her "just briefly a couple of times," as "more of a check-in."  AR 1857:3-13; 1873:10-18.

Ms. Johnston testified that the overall goal for N.N.'s senior year in high school concerned the development of her reading skills and timely completion of N.N.'s essay assignments.  AR 1908:16-22; 1911:12-15; 1913:8-10.  To that end Ms. Johnston established a reading program in which N.N. would select four books of interest to her that she would read over the course of the year.  AR 424; 1913:9-14.  Ms. Johnston regularly checked with N.N. on her progress, noting that N.N. "did not persist well" independently with the reading program.  AR 1913:10, 25; 1914:1-4.  Ms. Johnston also assisted N.N. in editing school essay assignments.  AR 1918:2-4.  Rather than go through the editing process together, N.N. preferred to receive Ms. Johnston's comments and then edit her work independently.  AR 1918:5-13.  Ms. Johnston also met with N.N.'s English

teacher for the first time during a TFHS parent-teacher conference in November 2019.

AR 1916:3-8.  Thereafter, Ms. Johnston said that she would communicate with N.N.'s English

teacher by email or occasionally by phone, and usually, Ms. Johnston would reach out to that

teacher, rather than the other way around.  AR 1916:10-13.  Generally, Ms. Johnston reached out

to teachers to follow-up on what students would report to her in terms of their progress or issues in

a class.  AR 1917:3-7.  With respect to N.N., Ms. Johnston and N.N.'s English teacher agreed on

N.N.'s progress in reading and writing, including that N.N. would read only if reading was

assigned, but otherwise did not read anything (other than perhaps a short magazine article) on her

own initiative.  AR 1917:8-15.  As for writing, Ms. Johnston and N.N.'s English teacher also

agreed that while N.N.'s written expression was "well done," it was "a painfully slow process for

her," and that it was "not a question of intelligence but just a question of habit development and

skill development."  AR 1917:23-24; 1918:20-1919:3.

Ms. Johnston did not communicate with N.N.'s other teachers to the same degree as she

did with N.N.'s English teacher.  However, she did keep in touch with N.N.'s math teacher, noting

that math was "an area of strength" for N.N. because N.N. is "willing to persist in math" and had a

good rapport with her teacher.  AR 1919:4-14.  Ms. Johnston did not believe that N.N. had a math

leaning disability.  AR 2024:20-23.

Ms. Johnston's weekly reports for the first part of N.N.'s senior year indicate that N.N.

generally met her Explorations study hall and individual sessions and maintained As and Bs in her

classes, with Cs in Biotech and English classes.  By the end of October 2019, Ms. Johnston noted

that N.N. had brought all of her grades back up to As and one B+, while continuing to plan for

college and following through on her reading program.  AR 421-27.  Overall, Ms. Johnston noted

that in her senior year at TFHS, N.N. "improved wonderfully" in "being able to stay on top of her

school work, organize her time, [and] keep her planner."  AR 1915:13-15.  Although N.N. still

struggled a little with completing her essays on time, Ms. Johnston observed that N.N.'s overall

approach was much more organized.  AR 1915:15-23.

N.N. remained at TFHS throughout the 2019-2020 school year and finished her high

school career with nearly straight As.  AR 1052.  She graduated in June 2020 with a regular

diploma, awards in math and science, and an academic letter.  AR 1857:15-20; 2223:17-2224:1, 6-12.

## II.    PROCEDURAL HISTORY

As discussed above, T.T. filed her first due process complaint against the District in December 2018, and withdrew it in January 2019.  T.T. filed a second due process complaint in April 2019 and withdrew that complaint in June 2019.  T.T.'s third due process complaint was filed in August 2019 and withdrawn in November 2019.  *See* AR 125; 2366:15-18; 2367:2-3; 10-13, 2368:7-12; 2462:17-24.  On March 18, 2020, T.T. (represented by plaintiffs' current litigation counsel) filed a fourth due process complaint against the District.  AR 1-18.  The matter proceeded to a hearing, held on June 23-25, 30 and July 1-2, 2020, before ALJ Ted Mann.  ALJ Mann issued his decision on August 28, 2020, finding in favor of the District.  As stated in his decision, the issues to be decided were as follows:

> 1. Did [the District] deny Student a free appropriate public education, referred to as a FAPE, by failing to timely respond to Parent's May 2018 request for assessment?
>
> 2. Did [the District] deny Student a FAPE by failing to conduct an appropriate psychoeducational evaluation prior to the September 18, 2018 individual educational program, referred to as an IEP, team meeting?
>
> 3. Did [the District] deny Student a FAPE by failing to invite all necessary members to the IEP team meetings held regarding Student in:  a.  September 2018?  b. May 2019?[18]
>
> 4. Did [the District] deny Student a FAPE, during the 2017-2018, 2018-2019, and 2019-2020 school years by failing to identify her as a student eligible for special education and offering her an appropriate IEP?
>
> 5. Did [the District] deny Student a FAPE at the September 2018 and May 2019 IEP team meetings by failing to offer Student an IEP?

AR 1069.  ALJ Mann concluded that the District did not deny N.N. a FAPE at any time because plaintiffs did not meet their burden to show that N.N. was eligible for special education.  AR 1068-96.

---

[18] Plaintiffs have not raised this issue on the present appeal before this Court.

1    Plaintiffs filed the present IDEA appeal in this Court on November 13, 2020.  Dkt. No. 1.

2   During the litigation, a dispute arose between the parties regarding whether plaintiffs should be

3   permitted to supplement the administrative record with testimony from Dr. Paula Solomon, a

4   clinical psychologist retained by plaintiffs and whom plaintiffs disclosed for the first time during

5   the administrative due process hearing.  Although ALJ Mann permitted Dr. Solomon to testify

6   about some matters during the administrative hearing (AR 2320-42), plaintiffs argued that ALJ

7   Mann had unfairly limited the scope of her testimony.  Following briefing and a hearing, the Court

8   granted in part and denied in part plaintiffs' request to supplement the record with testimony by

9   Dr. Solomon.  Dkt. No. 48.  The Court held an evidentiary hearing on July 16, 2021 at which both

10  Drs. Solomon and Nutter testified.  Dkt. Nos. 52, 57.

11    The parties subsequently submitted their respective briefs on the present IDEA appeal and

12  the Court held a hearing on the matter.  Dkt. Nos. 55, 56, 59, 61, 63.  As presented in the parties'

13  briefing, the main issues to be resolved are as follows:

> 1.  Whether the District denied N.N. a FAPE during the 2017-2018, 2018-2019, and 2019-2020 school years by failing to identify her as a student eligible for special education and failing to offer her an appropriate IEP?
>
> 2.  Whether the District denied N.N. a FAPE by failing to timely respond to T.T.'s May 1, 2018 request for assessment?
>
> 3.  Whether the District Denied N.N. a FAPE by failing to conduct an appropriate psychoeducational evaluation?
>
> 4.  Whether T.T. is entitled to reimbursement for the private educationally-related services and placement she provided N.N. in the absence of an offer of FAPE from the District?

22  Dkt. No. 55 at 7; Dkt. No. 59 at 8; *see also* Dkt. No. 1 ¶ 21.  As discussed below, the District

23  maintains that N.N. was not eligible for special education.  The District also raises two issues,

24  raised during the administrative proceedings, concerning the IDEA's statute of limitations and

25  whether the District remained N.N.'s responsible local education agency after she moved to

26  Montana.  *See* Dkt. No. 59 at 8.

27  **III.    STATUTORY FRAMEWORK**

28    Congress enacted the IDEA "to ensure that all children with disabilities have available to

them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A). Under the IDEA, all children with disabilities are entitled to a FAPE. *Id*. § 1412(a)(1). A FAPE means "special education and related services" that:

> (A) have been provided at public expense, under public supervision and direction, and without charge;
>
> (B) meet the standards of the State educational agency;
>
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
>
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

*Id*. § 1401(9). "Special education" is "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability." *Id*. § 1401(29); *see* 34 C.F.R. § 300.39(a)(1); *L.J. by and through Hudson v. Pittsburgh Unified Sch. Dist.*, 850 F.3d 996, 1004 (9th Cir. 2017). "Related services" are "transportation, and such developmental, corrective, and other supportive services . . . as may be required to assist a child with a disability to benefit from special education[.]" 20 U.S.C. § 1401(26); 34 C.F.R. § 300.34(a).

The IDEA provides federal funds to assist state and local agencies in educating children with disabilities, but conditions such funding on compliance with certain statutory requirements, including that States provide every eligible child with a FAPE. *Endrew F. v. Douglas Cnty. Sch. Dist.RE-1,* 137 S. Ct. 988, 993 (2017); *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1469 (9th Cir. 1993). States also have a "child find" obligation to identify, locate, and evaluate all children who may require special education and related services. 20 U.S.C. §§ 1412(a)(3), (7), 1414(a)-(c); *Timothy O. v. Paso Robles Unified Sch. Dist.*, 822 F.3d 1105, 1110 (9th Cir. 2016). States are required to comply with the IDEA's procedural and substantive requirements, and state standards that are not inconsistent with the IDEA's federal standards are also enforceable in federal court. *J.L. v. Mercer Island Sch. Dist.*, 592 F.3d 938, 947 (9th Cir. 2010).

The IDEA provides for a cooperative process between parents and schools, culminating in

United States District Court
Northern District of California

1    the creation of an IEP for every disabled student.  20 U.S.C. § 1414; *Schaffer ex rel. Schaffer v.*

2    *Weast*, 546 U.S. 49, 53 (2005).  The IEP "must include an assessment of the child's current

3    educational performance, must articulate measurable educational goals, and must specify the

4    nature of the special services that the school will provide."  *Schaffer*, 546 U.S. at 53.  Additionally,

5    the IEP must be "reasonably calculated to enable the child to receive educational benefits."  *Bd. of*

6    *Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 207 (1982).

7         Schools are required to provide a "basic floor of opportunity" that "consists of access to

8    specialized instruction and related services which are individually designed to provide educational

9    benefit" to disabled students.  *Id*. at 201.  The IDEA does not require schools provide "a potential-

10   maximizing education" or services "to maximize each child's potential commensurate with the

11   opportunity provided other children."  *Id*. at 197 n.21, 198.  Rather, the IDEA requires schools to

12   provide an education "sufficient to confer some educational benefit" on the disabled student.  *Id*.

13   at 200.  While the IDEA requires an educational program that enables a disabled student to make

14   more than merely *de minimis* progress, the relevant question is whether an IEP "is *reasonable*, not

15   whether the court regards it as ideal."  *Endrew F.*, 137 S. Ct. at 999, 1001.  "To meet its

16   substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable

17   a child to make progress appropriate in light of the child's circumstances."  *Id*. at 999.

18        The IDEA also requires that the IEP allow the disabled student to receive an education in

19   the "[l]east restrictive environment."  *See* 20 U.S.C. § 1412(a)(5).  This means that schools are

20   required to ensure that, "[t]o the maximum extent appropriate," a student with disabilities is

21   educated with nondisabled students, unless "the nature or severity of the disability of a child is

22   such that education in regular classes with the use of supplementary aids and services cannot be

23   achieved satisfactorily."  *Id*. § 1412(a)(5)(A); *see also* 34 C.F.R. § 300.114(a)(2)(i)-(ii) (same).

24        Parents have the right to participate in both the development and continued implementation

25   of their child's IEP.  20 U.S.C. § 1415(b).  A party may present a complaint regarding "any matter

26   relating to the identification, evaluation, or educational placement of the child, or the provision of

27   a free appropriate public education to such child," and is entitled to an impartial due process

28   hearing before a state agency.  *Id*. § 1415(b)(6)(A), (f).  A party that disagrees with the results of

United States District Court
Northern District of California

the administrative hearing before the state agency, may bring an appeal in a district court.  *Id.*

§ 1415(i)(2)(A).  "In an action for judicial review of an administrative  decision, the burden of

persuasion rests with the party challenging the ALJ's decision."  *L.M. v. Capistrano Unified Sch.*

*Dist.*, 556 F.3d 900, 910 (9th Cir. 2009).

"In determining whether a student has received a FAPE in compliance with the IDEA, the

court conducts both a procedural and substantive inquiry."  *L.J.*, 850 F.3d at 1003.  "The court

considers whether the school complied with the procedures set forth in the IDEA."  *Id.* (citing

*Rowley*, 458 U.S. at 206-07).  The court also evaluates whether the student's IEP, or the lack

thereof, "was reasonably calculated to enable the child to receive educational benefits."  *Id.*

"Where a court identifies a procedural violation that denied a student a FAPE, the court need not

address the second substantive prong of the inquiry."  *Id.*  However, "[n]ot all procedural

violations constitute a denial of a FAPE."  *Id.* (citing *R.B. v. Napa Valley Unified Sch. Dist.*, 496

F.3d 932, 938 (9th Cir. 2007)).  Procedural violations that result in the loss of educational

opportunity or seriously infringe the parents' opportunity to participate in the IEP formulation

process results in the denial of a FAPE.  *Id.* (citation omitted).  But "[a] procedural error is

harmless if the student is substantively ineligible for IDEA benefits."  *Id.*

## IV.    STANDARD OF REVIEW

In an action challenging an administrative decision under the IDEA, the district court

"(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence

at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall

grant such relief as the court determines is appropriate."  20 U.S.C. § 1415(i)(2)(C).  Thus,

"[j]udicial review in IDEA cases 'differs substantially from judicial review of other agency

actions, in which courts are generally confined to the administrative record and are held to a

highly deferential standard of review.'"  *M.C. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d

1189, 1194 (9th Cir. 2017) (quoting *Ojai*, 4 F.3d at 1471).  In assessing a challenge to an

administrative decision, courts should give "due weight" to state administrative proceedings and

must not "substitute their own notions of sound educational policy for those of the school

authorities which they review."  *Rowley*, 458 U.S. at 206.  While the amount of deference that the

court gives to the ALJ's findings is discretionary, it "increases where [the findings] are thorough and careful." *Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 891 (9th Cir. 1995) (internal citations omitted).  As explained by the Ninth Circuit:

> The court reviews *de novo* the appropriateness of a special education placement under the IDEA.  Nevertheless, when reviewing state administrative decisions, courts must give due weight to judgments of education policy.  Therefore, the IDEA does not empower courts to 'substitute their own notions of sound educational policy for those of the school authorities which they review.  Rather, the court in recognition of the expertise of the administrative agency, must consider the findings carefully and endeavor to respond to the hearing officer's resolution of each material issue.  After such consideration, the court is free to accept or reject the findings in part or in whole.  Despite their discretion to reject the administrative findings after carefully considering them, however, courts are not permitted simply to ignore the administrative findings.  At bottom, the court itself is free to determine independently how much weight to give the administrative findings in light of the enumerated factors.

*Cnty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996) (internal quotations and citations omitted).

## V.    DISCUSSION

Plaintiffs contend that the District committed several procedural violations that caused the District to deny N.N. a FAPE by failing to identify her as a student eligible for special education services in each of the school years 2017-2018, 2018-2019 and 2019-2020.  The District maintains that it fulfilled its child find and other obligations and properly determined that N.N. is not eligible for special education services.

### A.    Level of Deference to ALJ's Decision

Preliminarily, the Court must determine the level of deference it should give to the ALJ's decision.  Courts "treat a hearing officer's findings as 'thorough and careful' when the officer participates in the questioning of witnesses and writes a decision 'contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions.'" *R.B.*, 496 F.3d at 942 (quoting *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031 (9th Cir. 2006)).  "But neither the duration of the hearing, nor the ALJ's active involvement, nor the length of the ALJ's opinion can ensure that the ALJ was 'thorough and careful.'" *M.C.*, 858 F.3d at 1194.  Moreover, "blind deference" to the "length and superficial plausibility" of an ALJ's opinion is not

1    appropriate.  *Id*. at 1194 n.1.  Rather, a court "must actually examine the record to determine

2    whether it supports the ALJ's opinion."  *Id*.

3            Here, the ALJ conducted a 6-day hearing in which he actively participated in the

4    questioning of witnesses.  However, his written decision (less than 29 full pages) is not

5    particularly lengthy.  While he did summarize some portions of the record, he did not provide a

6    comprehensive recitation of the facts or detailed analysis and explanation for his findings.  Indeed,

7    as discussed below, he did not address certain issues at all.  Accordingly, the ALJ's findings do

8    not warrant the same deference afforded to "thorough and careful" findings.

9            **B.    Threshold Issues**

10           Before turning to the parties' respective arguments regarding the District's child find

11   obligations, the Court first addresses two threshold issues that the District contends limit the scope

12   of relief sought by N.N.  First, the District argues that plaintiffs' claims are time-barred to the

13   extent they are based on events that occurred prior to March 18, 2018.  Second, the District

14   contends that it ceased to be responsible for N.N. after August 2018 when she enrolled in TFHS.

15   Although the parties presented arguments regarding these issues to the ALJ, the ALJ did not

16   address either of these issues in his decision.  *See* AR 114-19; 122-28; 176-83; 232-35; 252-55;

17   1068-96.[19]

18           **1.    IDEA's Statute of Limitations**

19           Noting that plaintiffs filed their due process complaint on March 18, 2020, the District

20   argues that any claims based on events occurring before March 18, 2018 are barred by the IDEA's

21   statute of limitations.  Dkt. No. 59 at 10-11.  Under the IDEA, a parent or agency must request a

22   due process hearing "within 2 years of the date the parent or agency knew or should have known

23

24   _____

     [19] Remand is appropriate where the record is insufficient to permit the district court "to make the
25   highly nuanced judgments necessary to resolve the claim[.]"  *Jessica E. v. Compton Unified Sch.
     Dist.*, No. CV16-04356-BRO (MRWx), 2017 WL 28649545, at *7 (C.D. Cal. May 2, 2017)
26   (citation omitted).  No one argues that the ALJ's failure to make findings on these issues requires
     remand, and the Court does not find remand to be necessary or appropriate in any event.  "Given
27   that the courts are authorized to take new evidence and may base their decisions on such new
     evidence, while a court must give an ALJ's findings 'due weight,' there is clearly no requirement
28   to remand if the ALJ fails to make necessary findings."  *Pajaro Valley Unified Sch. Dist. v. J.S.*,
     No. C06-0380 PVT, 2006 WL 3734289, at *4 (N.D. Cal. Dec. 15, 2006).

United States District Court
Northern District of California

1    about the alleged action that forms the basis of the complaint[.]" 20 U.S.C. § 1415(f)(3)(C); *see*

2    *also* Cal. Educ. Code § 56505(*l*) ("A request for a due process hearing arising under subdivision

3    (a) of Section 56501 shall be filed within two years from the date the party initiating the request

4    knew or had reason to know of the facts underlying the basis for the request. . . ."). In *Avila v.*

5    *Spokane Sch. Dist. 81*, 852 F.3d 936 (9th Cir. 2017), the Ninth Circuit held that the IDEA's two-

6    year limitations period requires courts to apply the discovery rule described in 20 U.S.C.

7    § 1415(f)(3)(C) "without limiting redressability to the two-year period that precedes the date when

8    'the parent or agency knew or should have known about the alleged action that forms the basis of

9    the complaint.'" *Id*. at 941, 944 (quoting 20 U.S.C. § 1415(f)(3)(C)). Further, *Avila* observed that

10   "[o]ther courts have held that the 'knew or had reason to know date' stems from when parents

11   know or have reason to know of an alleged denial of a free appropriate public education under the

12   IDEA, not necessarily when the parents became aware that the district acted or failed to act." *Id*.

13   at 944 (citing cases). Thus, "the IDEA's statute of limitations requires courts to bar only claims

14   brought more than two years after the parents or local educational agency 'knew or should have

15   known' about the actions forming the basis of the complaint." *Id*. at 937.

16          To the extent the District argues that the IDEA's limitations period was triggered when

17   T.T. became aware of facts concerning N.N.'s anxiety diagnosis (Dkt. No. 59 at 10-11), or that

18   plaintiffs may obtain a remedy only for the two years preceding the filing of their due process

19   complaint (Dkt. No. 59 at 10-11), the District's arguments are inconsistent with *Avila*. *Avila*

20   expressly rejected a "strict occurrence rule," which would have the effect of "[c]utting off

21   children's or parents' remedies if violations are not discovered within two years . . . [and] is not

22   consistent with the IDEA's remedial purpose." *See Avila*, 852 F.3d at 941, 942. Moreover, as the

23   District seems to acknowledge in its brief, the injury that is the basis of plaintiffs' March 2020 due

24   process complaint is the District's alleged failure to provide N.N. with a FAPE during the three

25   school years in question. *See* Dkt. No. 59 at 10; AR 1-18. The pertinent question is when T.T.

26   knew or had reason to know of the District's alleged denial of a FAPE under the IDEA, not

27   necessarily when she became aware of N.N.'s condition or that the District acted or failed to act.

28   *Avila*, 852 F.3d at 944.

The parties do not seriously dispute that T.T. reasonably knew or had reason to know of the District's alleged failure to provide N.N. with a FAPE by May 1, 2018 when she requested a special education assessment, and by which time T.T. had consulted with an educational consultant and an education law attorney. *See* Dkt. No. 59 at 11; Dkt. No. 61 at 3; *see also* AR 287. The May 1, 2018 date also is supported by the record. T.T. testified that she did not have any particular knowledge or experience in education law or special education. AR 1779:19-1780:1. The record is ambiguous as to exactly what information the District provided T.T. prior to May 2018. Mr. Betancur testified that he told T.T. in November 2017 "that special ed[ucation] support may be necessary down the road" and to "inquire about a special ed[ucation] eval[uation] if more is needed" beyond a 504 plan. AR 994; 2122:22-2123:17. However, Mr. Betancur did not provide T.T. with a copy of the IDEA procedural safeguards. AR 2124:14-16. While Mr. Rosenberg testified that the District's normal procedure was to provide parents receiving a 504 plan with documentation, including a brochure "that describes what eligibility means, what 504 plans are, what IDEA is, what special education services are," it is unclear whether T.T. actually received such documentation in the package of information regarding N.N.'s 504 plan. *See* AR 1225:7-10; 1809:19-23. T.T.'s testimony, unrefuted by the District, is that she first became aware that the District could have assessed N.N. for special education and that she had a right to request a due process hearing in May 2018, after she spoke with her attorney. *See* AR 1780:2-5; *see also* AR 116, 177 (plaintiffs' administrative briefing stating that the earliest plaintiffs were aware of their IDEA rights was April 30, 2018 or May 2018). Plaintiffs' claims are not time-barred, as their March 18, 2020 due process complaint timely was filed within two years from May 1, 2018.

## 2. Responsibility for N.N. after August 2018 enrollment at TFHS

The District contends that it ceased to be the local education agency ("LEA") responsible for N.N. after August 2018 when she enrolled in TFHS. Plaintiffs assert, and the District does not deny, that the District never disclaimed responsibility as N.N.'s LEA until just two weeks prior to the June 2020 administrative due process hearing. Plaintiffs maintain that as N.N.'s district of residence, the District's IDEA obligations to N.N. were ongoing and that the District remained

United States District Court
Northern District of California

1    responsible for offering her a FAPE even after August 2018.  For the reasons discussed below,

2    plaintiffs are correct.

3         This case presents a somewhat unusual situation where, as part of her placement at

4    Explorations, N.N. received a public school education in an out-of-state school district.

5    Nevertheless, courts have held that in cases where a student who is or should have been identified

6    as needing a special education assessment is enrolled in an out-of-district school, the school

7    district's IDEA obligations are based on "where the student resides, rather than where the student

8    is currently enrolled in school."  *R.B. v. North East Indep. Sch. Dist.*, No. SA-20-CV-01441-JKP,

9    2022 WL 488500, at *10 (W.D. Tex. Feb. 16, 2022); *see also Dist. of Columbia v. Abramson*, 493

10   F. Supp.2d 80, 85 (D.D.C. 2007) ("Just because Connecticut may have child find responsibilities

11   of its own and just because [student] is currently enrolled in school in Connecticut does not relieve

12   [the school district] from having to fulfill its own responsibilities as the LEA of residence to

13   evaluate the student and make FAPE available."); *S.B. v. San Mateo Foster City Sch. Dist.*, No.

14   16-cv-01789-EDL, 2017 WL 4856868, at *17 (N.D. Cal. Apr. 11, 2017) ("*Abramson* indicates

15   that what matters in determining the district's ongoing responsibilities is where the child resides,

16   rather than where they are currently enrolled in school.").  Insofar as the District contends that it

17   ceased to be N.N.'s responsible LEA based on her enrollment in TFHS, its arguments are contrary

18   to authority indicating that the focus should be on N.N.'s residency.[20]

19        A school district's child find obligations under the IDEA extend to "[a]ll children with

20   disabilities residing in the State[.]"  20 U.S.C. § 1412(a)(3)(A).  "California has adopted a

21   comprehensive statutory scheme to conform California special education law to the requirements

22   of the IDEA"  *B.H. v. Manhattan Beach Unified Sch. Dist.*, 35 Cal. App. 5th 563, 571 (2019).

23   California law determines which LEA is responsible for the provision of a FAPE and preparation

24

25   ---

26   [20] The District misplaces its reliance on the administrative decisions in *Bellflower Unified Sch. Dist. v. Cal. State Educational Agency*, (OAH 2018) Case No. 2018070037, 74 IDELR 274 and *Parent on Behalf of Student v. Arcadia Unified Sch. Dist.* (OAH 2014), Case No. 2014060827,

27   114 LRP 44606.  In *Bellflower*, the parent moved her residence outside the district.  Both *Bellflower* and *Arcadia* concerned California Virtual Academy ("CAVA") schools, which by

28   statute are charter schools that present a specific exception to the general residency rule under California law.  *See* Cal. Educ. Code §§ 47641, 47646.

United States District Court
Northern District of California

1    of an IEP.  *Id*.  Under California law, "[t]he determination of the responsible LEA is usually a

2    function of the parent's residency."  *Id*.  Residency under the IDEA and the California Education

3    Code is no "different from the ordinary determination of residency."  *Union Sch. Dist. v. Smith*, 15

4    F.3d 1519, 1525 (9th Cir. 1994) (concluding that the district where student's family maintained

5    their permanent residence, worked and paid taxes, was responsible for student's special

6    education).  "Generally, elementary and secondary school students must attend school in the

7    district in which their parent or legal guardian resides, and that school district is the appropriate

8    LEA."  *B.H.*, 35 Cal. App. 5th at 571; *see also* Cal. Educ. Code §§ 48200, 56028.

9           Here, it is undisputed that at all times T.T. maintained her permanent residence within the

10   District.  The District nonetheless argues that after August 2018, N.N. resided in Montana with

11   Ms. James, who signed some TFHS school forms as N.N.'s "guardian."  *See* Dkt. No. 59 at 16

12   (citing AR 1039; 1044).  Ms. James also testified that Explorations obtains documentation from

13   parents that she described as a "kind of a program and activity consent" allowing Explorations "to

14   be in that role for parents while they're not here."  AR 2215:3-6.  However, the District fails to

15   cite any authority supporting the proposition that Ms. James is N.N.'s "parent" or "legal guardian"

16   for purposes of determining N.N.'s responsible LEA.  "Parent," as defined in a section of the

17   California Education Code concerning special education, includes "[a] guardian generally

18   authorized to act as the child's parent, or authorized to make educational decisions for the child[.]"

19   Cal. Educ. Code § 56028(a)(3); *see Orange Cnty. Dep't of Educ. v. Cal. Dep't of Educ.*, 668 F.3d

20   1052, 1056 (9th Cir. 2011) ("[T]he definition of parent in [§] 56028 indisputably applies to

21   [§] 48200, at least under some circumstances.").  The District does not appear to claim that Ms.

22   James was N.N.'s "parent" under § 56028 (or any other authority); and, even if it did, § 56028

23   expressly provides that when more than one person qualifies to act as a parent, "the biological or

24   adoptive parent . . . shall be presumed to be the parent for purposes of this section unless the

25   biological or adoptive parent does not have legal authority to make educational decisions for the

26   child."  Cal. Educ. Code § 56028(b)(1).

27          There is no indication that T.T.'s parental rights were ever terminated or that she ceded

28   such rights, including educational rights, to Ms. James.  To the contrary, T.T. testified that she did

United States District Court
Northern District of California

1   not grant Ms. James, or anyone else, the right to make educational decisions for N.N.

2   AR 2454:22-24.  Ms. James also testified that T.T. never assigned any parental rights to Ms.

3   James, and that Ms. James enrolled N.N. at TFHS only with T.T.'s permission.  *See* AR 2238:16-

4   25, 2247:14-22.  Additionally, the TFHS enrollment form cited by the District identifies T.T. as

5   N.N.'s "Mother" and "Guardian" with "Legal Custody" over N.N.  *See* AR 1039.

6       The Court concludes that the District remained N.N.'s LEA and that its IDEA obligations

7   to N.N. were ongoing through the 2018-2019 and 2019-2020 school years.

8       **C.     Whether the District Denied N.N. a FAPE by Failing to Identify Her as a
         Student Eligible for Special Education and Offering an IEP during the 2017-**
9   **        2018 School Year**

10      In evaluating whether N.N. was denied a FAPE during her sophomore year at LAHS, the

11  ALJ focused exclusively on events following T.T.'s May 1, 2018 request for a special education

12  assessment.[21]  Although he found that the District's "assessment plan was three days late," he

13  concluded that N.N. "did not prove any delay by [the District] in conducting an assessment after

14  [T.T.]'s May 1, 2018 request resulted in a denial of a FAPE to [N.N.]."  AR 1072, 1073.  The ALJ

15  found that the District appropriately assessed N.N. as ineligible for special education at the

16  September 2018 and May 2019 IEP meetings.  He further explained that "even if there was a

17  procedural violation of three days," that delay "did not impede [N.N.]'s right to a FAPE or cause a

18  deprivation of educational benefits, nor did it impede [T.T.]'s opportunity to participate in the

19  decision-making process, because [N.N.] was not eligible for special education."  AR 1073.

20      Plaintiffs contend that the District's child find obligation was triggered by at least October

21  2017, when T.T. provided Mr. Rosenberg with the letter from N.N.'s pediatrician, who diagnosed

22  N.N. with anxiety and stated that "this medical diagnosis is significant enough that it might require

23  special accommodations in her educational program."  Dkt. No. 55 at 10; AR 275-76; 279;

24  1804:21-24.  Plaintiffs acknowledge that "[a] child find violation is a procedural violation of the

25  IDEA that can result in a substantive denial of a FAPE only if the student ultimately would have

26

27  _____

28  [21] As noted above, the ALJ's decision characterized the first issue for decision as whether the
    District denied N.N. a FAPE by failing to timely respond to T.T.'s May 2018 request for an
    assessment.  AR 1069.

United States District Court
Northern District of California

been found eligible for special education." Dkt. No. 55 at 12; *see also R.B.*, 496 F.3d at 942 ("A child ineligible for IDEA opportunities in the first instance cannot lose those opportunities merely because a procedural violation takes place. . . . In other words, a procedural violation cannot qualify an otherwise ineligible student for IDEA relief."). However, plaintiffs maintain that N.N. would have qualified for special education under the categories of emotional disturbance, other health impairment and specific learning disability, had the District timely assessed her during the 2017-2018 school year. Dkt. No. 55 at 13-18; Dkt. No. 61 at 6. They contend that, at the very least, alternative educational possibilities would have been better considered if the District timely had complied with its child find obligation. Dkt. No. 55 at 21-22.

The District maintains that its child find obligation was not triggered at any time during the 2017-2018 school year prior to T.T.'s May 1, 2018 request for a special education assessment. The District further contends that even if there was a child find violation, any such procedural violation did not result in the denial of a FAPE because N.N. did not require special education. *See* Dkt. No. 59 at 11, 14.

For the reasons discussed below, the Court agrees with plaintiffs that the ALJ erred in limiting his analysis to the period after May 1, 2018 and failing to evaluate the District's obligations to N.N. throughout her sophomore year at LAHS. His conclusion that the District's failure to satisfy its child find obligation did not result in the denial of a FAPE to N.N. for the 2017-2018 school year deserves no deference.

### 1. The IDEA's child find obligation

The IDEA's child find provision requires a school district to identify all students who may need evaluation for special education and related services. 20 U.S.C. § 1412(a)(3)(A). This obligation extends to students who are suspected of having a disability, even if the students advance from grade to grade. *Id.*; 34 C.F.R. § 300.111; *S.B.*, 2017 WL 4856868 at *13.

"In order to ensure that children with disabilities receive an appropriate education tailored to their unique condition, the IDEA requires that when a school district is afforded reason to suspect that a child has a disability, it 'conduct a full and individual initial evaluation' that ensures the child is assessed for 'all areas of suspected disability,' using a variety of reliable and

43

technically sound instruments." *Timothy O.*, 822 F.3d at 1109 (quoting 20 U.S.C. §§ 1414(a)(1), (b)(2)-(3)).  "Accordingly, the IDEA requires that every State have procedures in place that are designed to identify children who may need special education services." *Id*. at 1110 (citing 20 U.S.C. § 1412(a)(3)(A)).  "Once identified, those children must be evaluated and assessed for all suspected disabilities so that the school district can begin the process of determining what special education and related services will address the child's individual needs." *Id*. (citing 20 U.S.C. §§ 1412(a)(7), 1414(a)-(c)); *see also S.B.*, 2017 WL 4856868 at *13 ("Once a child is identified as potentially in need of specialized instruction and services, the district must conduct an initial evaluation to confirm the child's eligibility for special education."); 20 U.S.C. § 1414(a)(1); 34 C.F.R. § 300.301; Cal. Educ. Code, § 56302.1.  Either a parent or school district may initiate a request for an initial evaluation.  34 C.F.R. § 300.301(b).

The child find obligation is triggered when the school district "has reason to suspect a disability, and reason to suspect that special education services may be needed to address that disability." *See Dep't of Educ. of State of Hawaii v. Cari Rae S.*, 158 F. Supp.2d 1190, 1194 (D. Haw. 2001) (internal quotations and citation omitted); *S.B.*, 2017 WL 4856868 at *13.  The Ninth Circuit has noted "that a disability is 'suspected,' and therefore must be assessed by a school district, when the district has notice that the child has displayed symptoms of that disability." *Timothy O.*, 822 F.3d at 1119; *see also Simmons v. Pittsburg Unified Sch. Dist*., No. 4:13-cv-04446-KAW, 2014 WL 2738214, at *6 (N.D. Cal. June 11, 2014) ("The state has reason to suspect that a child may have a disability where: (1) there is a suspicion that a student has an impairment that is affecting the student's educational performance or (2) a parent requests special education services or an assessment of eligibility for special education services.").  For example, parents' "informed suspicions" may trigger a school district's child find obligation, even where the school district disagrees with those suspicions. *Timothy O.*, 833 F.3d at 1120 (quoting *Pasatiempo by Pasatiempo v. Aizawa*, 103 F.3d 796, 802 (9th Cir. 1996)).  Thus, "if a school district is on notice that a child may have a particular disorder, it *must* assess that child for that disorder, regardless of the subjective views of its staff members concerning the likely outcome of such an assessment." *Id*. at 1121.  Courts within the Ninth Circuit have described the threshold for

suspecting that a child has a disability as "relatively low." *See Cari Rae S.*, 158 F. Supp. 2d at 1195 (noting the unchallenged observations of the hearing officer "that the threshold for 'suspicion' is relatively low, and that the inquiry was not whether or not [the student] actually *qualified* for services, but rather, was whether she should be *referred* for an evaluation."). "Whether a school district had reason to suspect that a child may have a disability must be evaluated in light of the information the district knew, or had reason to know, at the relevant time, not in hindsight." *Simmons*, 2014 WL 2738214 at *6; *see also L.J.*, 850 F.3d at 1004 ("The appropriateness of a student's eligibility should be assessed in terms of its appropriateness at the time of the child's evaluation and not from the perspective of a later time with the benefit of hindsight.") (citing *Adams v. Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999)).

On October 5, 2017, shortly before her October 26, 2017 email to Mr. Rosenberg appending the anxiety diagnosis by N.N.'s pediatrician, T.T. advised Mr. Rosenberg that N.N. "is feeling extremely overwhelm [sic] with the transition of 9th grade to 10th grade. She has stressed to her therapist and tutor this feeling of not being able to catch up or enough time because of a lot of homework." AR 277. T.T. previously informed the District, at the end of N.N.'s freshman year, that N.N. had been "going through a very difficult and emotional period recently." *Id*. While the District points out that N.N. finished her freshman year at LAHS with a 3.0 grade point average (*see* AR 297), in the first quarter of her sophomore year, N.N. was getting a B+ in chemistry, a D in algebra II, a D- in AP human geography, a C in Spanish and an F in honors world literature. AR 482. At the administrative hearing, Mr. Rosenberg acknowledged that "[t]here was a pretty dramatic change in [N.N.'s] performance from freshman to sophomore year" and that "it was evident by October." AR 1209:3-5; *see also* AR 297. At that time, the District did not refer N.N. for a special education assessment and instead developed a 504 plan that provided accommodations for extra time on assignments and tests, the opportunity to test in a separate space, and monthly meetings with teachers. AR 281. The District's 504 plan expressly identified N.N.'s disability as "[a]nxiety" and noted that "[a]nxiety limits learning." *Id*.

The District argues that it met its child find obligation by promptly convening a meeting in November 2017 and developing a 504 plan, and further suggests that under the circumstances it

United States District Court
Northern District of California

was reasonable for the District to first proceed with a 504 plan to see if the accommodations

worked.  Dkt. No. 59 at 12.  Additionally, the District asserts that to avoid "over-identifying"

students as disabled, it is required under the IDEA and California Education Code § 56303 to use

general education resources, where appropriate.  *See* Dkt. No. 59 at 9 (citing *Los Angeles Unified*

*Sch. Dist.*, 548 F. Supp. 2d 815, 819-20 (C.D. Cal. 2008)).  However, adopting a 504 plan and

implementing accommodations does not satisfy a school district's obligations to conduct a special

education assessment under the IDEA.  While a school district must use regular education

resources, where appropriate, to address a student's exceptional needs, it cannot delay an

*assessment* of the student's needs on that basis.  *See, e.g., Simmons*, 2014 WL 2738214 at *9

(noting with approval the ALJ's acknowledgement that while "'a district is required to utilize the

resources of its regular education program, where appropriate, to address a student's exceptional

needs, it may not delay its assessment of a student with a suspected disability on the basis that it is

utilizing a response to intervention approach to accommodate the student in a regular education

program.'").  To the extent the District suggests that state law requires otherwise, the District is

correct that California law states that "[a] pupil shall be *referred* for special educational instruction

and services *only after* the resources of the regular education program have been considered and,

where appropriate, utilized."  Cal. Educ. Code § 56303 (emphasis added).  That statute, however,

does not appear to address special education assessments.  In any event, state law cannot override

the IDEA's requirements regarding the District's child find obligation.  *See J.L.*, 592 F.3d at 947.

Nor is the District relieved of its duty to assess N.N. based on Mr. Rosenberg's opinion

that the 504 plan was appropriate for her.  Although N.N.'s 504 plan expressly identifies N.N.'s

disability as "[a]nxiety" and states that "[a]nxiety limits learning" (AR 281), Mr. Rosenberg

testified that this is merely "boilerplate" language that the District "use[s] to drive a student to—

appropriately served by 504 accommodations."  AR 281, 1224:5-10.  Noting that LAHS has "at

least tens of students with similar sorts of challenges," i.e., "a diagnosis of anxiety [that] appears

to be affecting their schoolwork," Mr. Rosenberg stated that "the first step in terms of addressing

that student's needs is creating a 504 plan" and that "[o]n almost all bases, the 504 plan is

sufficient for the student's needs."  AR 1224:16-18; 1287:4-5.  Further, Mr. Rosenberg testified

United States District Court
Northern District of California

1    that in his experience, challenges that "appear[] to be conflict at home and the associated issues"

2    are "situational" and could be addressed without the need for special education services.

3    AR 1264:19-1265:2.  However, LAHS was not free to disregard its obligation to assess N.N. for

4    special education services once it had reason to believe that N.N. suffered from a disability that

5    impacted her ability to access her education.  "School districts cannot circumvent th[eir]

6    responsibility [to assess a student with a suspected disability] by way of informal observations, nor

7    can the subjective opinion of a staff member dispel such reported suspicion." *Timothy O.*, 822

8    F.3d at 1119.  At the administrative hearing Mr. Rosenberg acknowledged that the decline in

9    N.N.'s academic performance was "significant," that "it was evident by October," and that

10   "whatever the source of the anxiety was . . . it was, in fact, affecting her performance."

11   AR 1209:3-5; 1219:22-1220:1.

12          The District asserts that it also offered N.N. "school-based therapy, a support offered to all

13   general education students," which plaintiffs reportedly "declined."  Dkt. No. 59 at 12.  The record

14   indicates that this offer of "school-based therapy" consisted of informing T.T. of the name of a

15   school nurse and a school therapist that N.N. could reach out to if she felt overwhelmed at school.

16   AR 1204:14-18; 1228:10-21; 1279:1-11; 1793:7-1794:2; 1808:7-25.  Although it is unclear

17   whether N.N. actually used these resources, there is no indication that plaintiffs "declined" these

18   services.  In any event, the District cites no authority for the proposition that offering such

19   supports obviates the duty to assess a student with a suspected disability.

20          Even if it might have been reasonable for the District to wait *some* period of time to see if

21   the 504 plan accommodations were effective, the record indicates that the District had ample

22   information by March 2018 to suspect that N.N. had a disability requiring an assessment.  By that

23   time, N.N.'s 504 plan accommodations had been in place for about 4 months, yet her grades

24   continued to decline, she dropped her second world literature course, her teachers noted that she

25   was regularly leaving class and expressed concern about her declining academic performance, and

26   her mother had enrolled her in intensive outpatient treatment at CHC.  AR 967-969; 998-1000;

27   1824:16-19.  *See, e.g., S.B.*, 2017 WL 4856868 at *14 (concluding that the school district violated

28   its child find obligation when it failed to assess student, even after they knew of student's ADHD

diagnosis, student's teacher expressed concerns about focus issues, and parents notified the school that they were having student assessed for "latent learning disabilities.").

The District points out that Ms. Mark, N.N.'s (second) world literature teacher, testified that she never considered referring N.N. for special education services because Ms. Mark did not believe N.N. "was struggling because of a learning disability." AR 1325:11-16. Similarly, the District notes that N.N.'s chemistry teacher, Ms. Mattson, did not believe that N.N.'s anxiety affected her performance because "her homework still showed that she had a solid understanding. Her test and quizzes decreased but were in normal range." AR 1351:7-9. And N.N.'s Spanish teacher, Mr. Murillo, testified that he felt N.N. "was able to do . . . the work. When she put her head to it—when she sat down and actually delivered[.]" AR 1372:20-22. However, the District's obligations under the IDEA extend to "a wide spectrum" of disabled students, including those like N.N. whose disability is not primarily cognitive, but emotional or psychological. *Rowley*, 458 U.S. at 202. As discussed above, the record amply demonstrates that N.N.'s anxiety was significantly impacting her school attendance and performance.

The District notes that Ms. Leydecker, N.N.'s CHC therapist, also did not refer N.N. for special education services and testified that if she determined that a student's mental health was interfering with their education, she (like the District) "would discuss a 504 plan" and then would discuss special education services if the 504 plan did not meet the student's needs. AR 1469:13-20. However, Ms. Leydecker explained that she did not tell T.T. to request a special education evaluation because CHC's priority is to stabilize a child's mental health, and CHC refers families back to the school for "school-based things[.]" AR 1475:21-1476:7. While Ms. Leydecker acknowledged that "a lower level" of anxiety or depression might be addressed with a 504 plan, she testified that she considered N.N.'s needs to be "high-risk." AR 1452:2-11; 1468:18-25.

In any event, the District does not seriously dispute that it failed to timely develop an assessment plan in response to T.T.'s May 1, 2018 email requesting an assessment. Unless a student's parent or guardian agrees in writing to an extension, California law requires the District to develop a proposed assessment plan "within 15 calendar days of referral for assessment, not counting calendar days between the pupil's regular school sessions or terms or calendar days of

school vacation in excess of five schooldays[.]"  Cal. Educ. Code § 56043(a).  In view of T.T.'s

May 1, 2018 request for an assessment (AR 963-64), the District had until Wednesday, May 16,

2018 to develop an assessment plan.  It is unclear exactly when the District provided its plan to

T.T.; the only confirmation in the record is Ms. English's Friday, May 18, 2018 email to T.T.

stating that the plan had been mailed to her that week.  AR 963.  The ALJ concluded that the

District's plan was three days late (AR 1072); the District seems to contend that its assessment

plan was, at most, one day late (Dkt. No. 59 at 14).[22]

In sum, the preponderance of evidence reflects that the District was on notice by at least

November 2017, and certainly no later than March 2018, that N.N. might have a disability

requiring an assessment.  The District unreasonably delayed undertaking a special education

assessment of N.N.

### 2.    Denial of a FAPE

Whether the District provided an assessment plan one day or three days late, by reference

to T.T.'s May 1, 2018 request, or several months late, the parties appear to agree that the delay is a

procedural misstep that, in and of itself, is not actionable unless it resulted in a denial of a FAPE.

*See* Dkt. No. 55 at 12; Dkt. No. 59 at 14.  "A child is denied a FAPE when procedural

inadequacies result in the loss of an educational opportunity, or seriously infringe on the parents'

opportunity to participate in the IEP formulation process."  *L.J.*, 850 F.3d at 1003 (citing *Doug C.*

*v. Hawaii Dep't of Educ.*, 720 F.3d 1038, 1043 (9th Cir. 2013)).  "A procedural error is harmless if

the student is substantively ineligible for IDEA benefits."  *Id.* (citing *R.B.*, 496 F.3d at 942).

The ALJ concluded that the District's untimely provision of an assessment plan was a

harmless error and did not result in the denial of a FAPE because N.N. was not eligible for special

education services.  AR 1073.  For that reason, the District argues that the ALJ's conclusion

should be affirmed.  *See* Dkt. No. 59 at 14, 15.  As discussed above, however, in addressing this

---

[22] Here, the District argues that because T.T. did not request an assessment until 9:26 p.m. on May 1, 2018, the District did not actually receive the request until May 2, 2018, and therefore had until May 17, 2018 to develop an assessment plan.  Dkt. No. 59 at 14.  The District has cited no authority indicating that the lateness of the hour at which T.T. sent her request extended the 15-day period for providing an assessment plan.  In any event, Ms. English responded to T.T.'s May 1, 2018 email that same night.  AR 963.

United States District Court
Northern District of California

issue the ALJ did not consider all the evidence relevant to the 2017-2018 school year.  Moreover, he improperly based his conclusion on the perspective of a later time and with the benefit of the hindsight observation that N.N. "was appropriately assessed and was not eligible for special education at the September 2018 IEP, and again at the May 2019 IEP."  AR 1073.

"[T]o succeed on a claim that a child was denied a free appropriate public education because of a procedural error, the individual need not definitively show that his educational placement would have been different without the error."  *Timothy O.*, 822 F.3d at 1124.  "A loss of an educational opportunity occurs, for example, when there is a 'strong likelihood' that, but for the procedural error, an alternative placement 'would have been better considered.'"  *Id.* (quoting *Doug C.*, 720 F.3d at 1047); *see also L.J.*, 850 F.3d at 1008 ("Here, there is reason to believe that alternative services would have at least been more seriously considered during the IEP process if the School District had assessed L.J.'s health, including the effects of his medication on his health.").

Here, the record demonstrates that by March 2018, there is reason to believe that alternative services would at least have been more seriously considered if the District had timely assessed N.N.  The District does not offer any argument disputing that by at least the spring of 2018, N.N. had been diagnosed with major depression and anxiety.  *See* Dkt. No. 59 at 11-15.  As discussed above, the overwhelming evidence is that N.N. was not making meaningful academic progress at LAHS, even with the accommodations provided in the District's 504 plan.  Over the course of her sophomore year, N.N.'s grades declined, and as noted by teachers, she was not engaging in the material, was missing class, and was essentially failing her courses.  *See* AR 967-969, 998-1000.  The District failed to timely consider the merits of continuing with the District's 504 plan or whether alternative services were needed, and therefore denied N.N. a FAPE for the 2017-2018 school year.

## D. Whether the District Failed to Conduct an Appropriate Psychoeducational Evaluation

The ALJ found that plaintiffs did not establish that the District's psychoeducational evaluation was inappropriate.  AR 1073-84.  After reviewing Dr. Nutter's analysis, the ALJ

concluded that her evaluation "met the legal requirements to evaluate [N.N.] for her possible eligibility for special education under the three categories of suspected disability and provided a solid foundation for the IEP teams' later determination that [N.N.] was not eligible for special education." AR 1084.

Plaintiffs contend that the District's initial 2018 psychoeducational evaluation of N.N. was inadequate—specifically, with respect to Dr. Nutter's assessment of N.N.'s emotional functioning. Chief among plaintiffs' complaints is that Dr. Nutter did not conduct a classroom observation of N.N. and did not interview N.N.'s past and present teachers and her then-current Explorations therapist, Mr. Boudousquie.  *See* Dkt. No. 55 at 22-23; Dkt. No. 61 at 11-12.  Plaintiffs also challenge the appropriateness of certain rating scales that Dr. Nutter used and contend that she should have employed projective measures of N.N.'s emotional functioning.  While plaintiffs appear to acknowledge that the failure to properly conduct an appropriate assessment is a procedural violation of the IDEA, *see Park*, 464 F.3d at 1031-33, they contend that the District's allegedly inadequate assessment "was a direct causal factor in its erroneous determination that N.N. was not eligible for special education, which in turn impeded her right to a FAPE."  Dkt. No. 55 at 23.

The Court addresses here plaintiffs' arguments regarding the conduct of Dr. Nutter's assessment.  To the extent the parties dispute Dr. Nutter's ultimate conclusion that N.N. was not eligible for special education and related services, those arguments are addressed below.

"Under the IDEA, the school district must conduct a 'full and individual initial evaluation,' one which ensures that the child is assessed in 'all areas of suspected disability,' before providing that child with any special education services."  *Timothy O.*, 822 F.3d at 1119 (quoting 20 U.S.C. §§ 1414(a)(1)(A), 1414(b)(3)(B)).  "The California Education Code, which incorporates the requirements of the IDEA into state law, similarly requires that the child be assessed 'in all areas related to the suspected disability.'"  *Id.* (quoting Cal. Educ. Code § 56320(f)).  "[T]his requirement serves a critical purpose:  it allows the child's IEP Team to have a complete picture of the child's functional, developmental, and academic needs, which in turn allows the team to design an individualized and appropriate educational plan tailored to the needs of the individual

51

1   child." *Id.*

2       The IDEA and its accompanying regulations "contain an extensive set of procedural

3   requirements that are designed to ensure that this initial evaluation (as well as any subsequent

4   reevaluations) achieves a complete result that can be reliably used to create an appropriate and

5   individualized educational plan tailored to the needs of the child." *Id.* at 1110. "First, the initial

6   evaluation must be designed not only to determine whether the child has a disability, but also 'to

7   gather relevant functional, developmental, and academic information about the child,' that can be

8   used to determine the child's individual educational needs." *Id.* at 1111 (quoting 34 C.F.R.

9   § 300.304(b)(1); 20 U.S.C. § 1414(a)(1)(C)). Second, school districts must provide parents with

10  notice describing any proposed evaluation procedures that the district proposes to conduct and

11  why the district has made those decisions. *Id.* Further, in conducting the evaluation, school

12  districts must:

13          1. Use a "variety of assessment tools and strategies" without relying
            on "any single measure or assessment as the sole criterion for
14          determining whether a child is a child with a disability or determining
            an appropriate educational program for the child," 20 U.S.C.
15          § 1414(b)(2)(A) & (B);

16          2. Use "technically sound instruments that may assess the relative
            contribution of cognitive and behavioral factors, in addition to
17          physical or developmental factors," *id*. § 1414(b)(2)(C); and

18          3. Ensure that all assessments are conducted by trained and
            knowledgeable personnel, in accordance with instructions provided
19          by the producer of the assessment, and for purposes which the
            assessments or measures are valid and reliable, *id*. § 1414(b)(3)(A).
20

21  *Id.*

22      In his decision, the ALJ noted the information Dr. Nutter considered in performing her

23  assessment:

24          Dr. Nutter completed her report of her evaluation on
            September 13, 2018. The report was based upon her review of
25          available records, teacher reports, her in-person testing in Montana,
            observation, an interview with [N.N.], Parent input, information
26          from [TFHS], the Explorations program, the Second Nature
            wilderness program, and the use of standardized assessment
27          measures. She also considered [N.N.]'s academic testing completed
            by Erica Starks, a [District] special education teacher.
28

United States District Court
Northern District of California

***

Dr. Nutter gathered information from [T.T.]  She reviewed [N.N.]'s available educational records from [the District] for grades seven and later, as prior years had been sent to Montana as part of [N.N.]'s cumulative file.  She reviewed and summarized records from an intensive outpatient program that [N.N.] attended for approximately six weeks from March 12, 2018 through April 30, 2018.  She reviewed and summarized a report, dated August 17, 2018, from Dr. Coady Schueler, the psychologist who treated [N.N.] at the Second Nature program.  She summarized her interviews with director Penny James from Explorations, and principal Rich Ferris from [TFHS].  Dr. Nutter also observed [N.N.] during her eight hours of interview, observation, and testing that she conducted at Explorations in Montana on August 24, 2018.

AR 1076, 1077; *see also* 337-358; 1511:17-23; 1512:23-1515:25; 1662:10-19.  There is no serious dispute about the information Dr. Nutter did and did not obtain as part of her evaluation.[23]  The ALJ, however, did not address plaintiffs' arguments that Dr. Nutter should have gathered additional information, including classroom observation of N.N., information from her teachers at LAHS and at TFHS, and information from Mr. Boudousquie at Explorations.

In relevant part, the IDEA and accompanying regulations require that as part of an initial evaluation, the IEP team and other qualified professionals, "*as appropriate*," must "[r]eview *existing* evaluation data on the child, including . . . classroom-based observations and . . . [o]bservations by teachers and related services providers[.]"  20 U.S.C. § 1414(c)(1)(A)(ii), (iii); 34 C.F.R. § 300.305(a)(1)(ii), (iii) (emphasis added).  With respect to classroom observation of N.N., when Dr. Nutter tested and observed her on August 24-25, 2018, school was not yet in session.  AR 337; 1511:1-2; 1662:15-16.  The Court is not persuaded that Dr. Nutter should have delayed her assessment in order to observe N.N. in a classroom setting at TFHS, particularly in view of T.T.'s June 14, 2018 consent to the District's assessment plan and the District's obligation to timely complete its assessment and hold an IEP meeting within 60 days (excluding days

---

[23] The Court is unpersuaded by plaintiffs' argument that the ALJ "clearly erred" in stating that Dr. Nutter's evaluation included "teacher reports" and "observation."  *See* Dkt. No. 55 at 22 n.5.  Dr. Nutter did observe N.N.  While the ALJ's reference to "teacher reports" is vague, on the record presented, the Court is not prepared to find that he "clearly erred" in saying that Dr. Nutter considered such reports as part of her assessment.  Dr. Nutter did review N.N.'s school records, and she testified that she spoke to Mr. Ferris, who in turn had "gathered teacher reports."  AR 1645:3-11; *see also* AR 1755:20-21.

United States District Court
Northern District of California

between school sessions and absent exceptions, such as the parent's agreement to an extension).
*See generally* 20 U.S.C. § 1414(a)(1)(C)(i)(I); Cal. Educ. Code § 56043(c), (f)(1); § 56302.1; *see also M.M. v. Lafayette Sch. Dist.*, 767 F.3d 842, 853 (9th Cir. 2014) (finding that the school district did not procedurally violate the IDEA in failing to review certain data in its initial evaluation, noting that "[t]he qualifier 'if appropriate,' negates an express statutory requirement to review existing evaluation data as a part of the initial evaluation.").  Additionally, when asked at the administrative hearing why she did not obtain rating scales from N.N.'s teachers at TFHS, Dr. Nutter testified that at that time, N.N.'s teachers had not known her long enough to provide a reasonable assessment.  *See* AR 1604:15-19 ("They have not known N.N. long enough.  Well, first of all, when I started the assessment, she wasn't in school.  Second, there has to be a reasonable amount of knowledge of the student.  And less than a month is not considered reasonable.").
Plaintiffs have not provided a basis to question Dr. Nutter's professional judgment on that point.

Plaintiffs argue that Dr. Nutter should have obtained information from N.N.'s teachers at LAHS, noting that they had serious concerns about N.N.'s attendance, classroom participation, and grades during the 2017-2018 school year, and that such information was relevant to N.N.'s performance in the general education setting.  *See* AR 968-970; 997-1000.  Plaintiffs correctly note that information about a student's past behavior appropriately is part of the "snapshot" that a school district should consider.  *See Tamalpais Union High Sch. Dist. v. D.W.,* 271 F. Supp. 3d 1152, 1160 (N.D. Cal. 2017).  However, plaintiffs point to no particular information or feedback from N.N.'s LAHS teachers that is not already reflected in Dr. Nutter's report.  Indeed, in discussing N.N.'s social and academic history, Dr. Nutter specifically noted that "[s]ophomore year was challenging for [N.N.], emotionally and academically"; that "[h]er interest in school declined significantly"; and that N.N. ended the first semester with a 1.5 grade point average.  AR 339.  Dr. Nutter further noted that N.N. "continued to struggle throughout second semester.  Her academic disengagement increased; she'd leave class for several minutes at a time, missing key information.  Her work completion declined significantly and her use of drugs continued."  *Id*.  At the due process hearing, Dr. Nutter testified that additional information from N.N.'s LAHS teachers would not have been helpful to her report because Dr. Nutter "had enough history to

United States District Court
Northern District of California

United States District Court
Northern District of California

1    understand what [N.N] looked like" and that the information that Dr. Nutter received from Mr.

2    Rosenberg, T.T., and N.N. "was all consistent."  AR 1645:15-20.  Plaintiffs have presented no

3    evidence to the contrary.

4            Relying on Dr. Solomon's testimony at the July 2021 evidentiary hearing, plaintiffs

5    contend that Dr. Nutter's assessment was "fatal[ly] flaw[ed]" because she did not use projective

6    measures of N.N's emotional functioning, and the only semi-projective measure used (the

7    "incomplete sentences" test) was not referenced in Dr. Nutter's report.  Dkt. No. 61 at 11.  Dr.

8    Solomon's testimony, however, does not bear the weight that plaintiffs place upon it.  Dr.

9    Solomon testified that compared to rating scales (where test subjects respond by choosing from

10   among a pre-defined set of answers), more open-ended projective measures (such as interpreting

11   pictures or ink blots) make it harder for test subjects to fake responses that may, for example,

12   suggest that the test subject is functioning better than they actually are.  Additionally, Dr. Solomon

13   noted that testing standards require that all tests that are administered should be included in the

14   report.  Dkt. No. 57 at 13:2-15:21; 17:11-16; 17:22-18:2; 20:20-25.  However, Dr. Solomon also

15   testified that she has "no problem with rating scales," noting that "they provide quantitative data,

16   and everybody likes that.  They produce numbers.  So we all use them.  They're perfectly

17   useable."  *Id.* at 13:15-21.  While Dr. Solomon noted a couple of N.N.'s responses on the

18   incomplete sentences test that she interpreted as less than thoughtful or snarky (e.g., expressing a

19   desire to leave Explorations and expressing regret at not turning off her cell phone tracker), Dr.

20   Solomon was not able to say whether N.N. was faking her responses in any way during Dr.

21   Nutter's interview and testing process.  *Id.* 33:12-34:10; 34:13-17.

22           As for Mr. Boudousquie, there is no dispute that Dr. Nutter did not interview him or obtain

23   any information from him.  Indeed, Dr. Nutter testified that she was not made aware that N.N.

24   "had that type of therapeutic relationship at that time."  AR 1645:24-25; *see also* AR 1756:10-11

25   ("I was not given information that she was being treated when I was assessing her.").  Neither side

26   explains why Dr. Nutter did not have that information, and the record is unclear on that point.[24]

27

28   _____

[24] Mr. Boudousquie could not recall clearly, but testified that he did not remember "being around"
when Dr. Nutter conducted her assessment.  *See* AR 1978:6-10.

Dr. Nutter had information indicating that N.N. previously had been diagnosed with Major Depressive Disorder, Recurrent, Severe without psychotic features, and Generalized Anxiety Disorder, and that during the prior academic year she had undergone treatment for those conditions.  Plaintiffs' main point appears to be that Dr. Nutter's assessment is incomplete because it does not include Mr. Boudousquie's observation and opinion that N.N. had significant emotional issues at that time, even though she could and often did present herself to others as happy and social.  *See* Dkt. No. 55 at 23.  Here, plaintiffs point out that when asked at the due process hearing whether he believed N.N. was an accurate self-reporter of her own feelings, Mr. Boudousquie testified that he believed N.N. "was putting on a good face" because "she was wanting to try to get out of the program where she was at as quickly as possible, and she thought by putting on a good face that would happen."  AR 1988:16-19; Dkt. No. 55 at 23.

What is not clear, however, is whether Mr. Boudousquie would have had that insight or information to provide at the time of Dr. Nutter's assessment.  Dr. Nutter evaluated N.N. on August 24-25, 2018, when N.N. had been at Explorations for about three weeks.  AR 337.  Mr. Boudousquie testified to his impression that "N.N., when she came from [the Second Nature] Wilderness [program], was fairly positive on the outside."  AR 1988:9-10.  Mr. Boudousquie further agreed that N.N. "would not seem sad or depressed unless you were around her for . . . a little bit of time."  AR 1990:8-10.  It was only as he got to know N.N. that he observed symptoms of depression, which manifested in feelings of frustration and anger, and was not "always just moping around or whatever[.]"  AR 1988:10-11, 1990:4-24, 1991:17-25, 1994:3-16.  Ms. James, whom Dr. Nutter did interview, similarly testified that when N.N. had been at Explorations for about four or five weeks, Ms. James did not see N.N.'s depression because N.N. did not present herself with "sulky and down" behavior.  AR 2196:18-24; 2197:8-11.  Noting that she has "known N.N. for a long time now," Ms. James stated that it was only "over time" that N.N. "did manifest her depression, as many teenagers do, with low frustration tolerance.  Sometimes high irritability, episodes of . . . anger that comes from that low frustration tolerance."  AR 2197:15-19, 22.  On this record, the Court is not persuaded that Dr. Nutter's failure to interview Mr. Boudousquie in August 2018 rendered her assessment incomplete because it did not include available information

about N.N.'s current emotional functioning.

The Court finds that the District did not procedurally violate the IDEA by providing an inadequate psychoeducational assessment.

### E. Whether the District Denied N.N. a FAPE by Failing to Identify Her as a Student Eligible for Special Education and Offering an IEP for the School Years 2018-2019 and 2019-2020

For the 2018-2019 and 2019-2020 school years,[25] the ALJ denied relief on the ground that N.N. was not eligible for IDEA benefits because she was able to access the general education curriculum at TFHS without any special education supports. The ALJ focused on the two IEP meetings held during N.N.'s junior year on September 18, 2018 and May 16, 2019,[26] and concluded that N.N. did not prove that the District denied her a FAPE by failing to offer her an IEP. *See* AR 1091-92, 1094. He discounted Dr. Medina's psychological evaluation and Dr. Solomon's hearing testimony and concluded that "[t]he weight of the testimony supported Dr. Nutter's findings and conclusions that [N.N.] was not eligible for special education." AR 1093-94. Specifically, the ALJ noted that N.N.'s "ability to perform well at [TFHS] on a comprehensive public campus with no accommodations or supports was a significant factor in support of the [September 18, 2018 IEP] team's conclusion, along with her reacquisition of emotional stability and affect." AR 1091. He further explained:

> [N.N.] provided evidence that she was doing well and making progress in Montana with the therapeutic program at Explorations, including tutoring and counseling combined with attendance at a public high school in a general education program. [N.N.] had also been provided with a 504 plan at [TFHS], providing accommodations similar to those provided in her [District] 504 plan from October 2017.
>
> ***
>
> [N.N.] contends that the after-school tutoring and study hall she received at Explorations, and the other individual and family counseling she received there, were necessary for her success at [TFHS]. However, [N.N.] failed to show that either tutoring or

---

[25] As noted above, the ALJ included in this part of his analysis his conclusions about whether the District denied N.N. a FAPE for the 2017-2018 school year. *See* AR 1086, 1094.

[26] The ALJ's decision indicates that the second IEP meeting occurred on May 14, 2019, but he appears to be referring to the date of the IEP meeting notice. *See* AR 466, 1092, 1094.

counseling were necessary for her to access her education at [TFHS], or that the tutoring or counseling was more than what was provided to general education students.

AR 1092, 1093-94.

The parties' primary point of contention is whether the therapy and other services N.N. received through Explorations were special education services necessary for her to access the general education curriculum at TFHS.  Plaintiffs argue that the ALJ improperly focused on N.N.'s positive performance at TFHS, without considering the larger context in which her functioning was being assessed.  They contend that N.N. was only able to succeed at TFHS because of her placement at Explorations and the services she received there.  The District maintains that N.N. did not need special education and that the services she received at Explorations are "related services" that, standing alone, do not support IDEA eligibility.

Under the IDEA, a "child with a disability" means a child:

> (i)   with intellectual disabilities, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this chapter as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, *or* specific learning disabilities; *and*
>
> (ii)  who, by reason, thereof, *needs special education and related services*.

20 U.S.C. § 1401(3)(A)(i), (ii) (emphasis added); *see also* 34 C.F.R. § 300.8(a)(1).  Similarly, California law defines an "[i]ndividual[] with exceptional needs" as a person identified by an IEP team as "a child with a disability, as that phrase is defined in [20 U.S.C. § 1401(3)(A)]," with an impairment that "requires instruction and services which cannot be provided with modification of the regular school program in order to ensure that the individual is provided a free appropriate public education pursuant to [20 U.S.C. § 1401(9)]."  Cal. Educ. Code § 56026(a), (b).

"Special education" is "'specially designed instruction' to meet the unique needs of a child with a disability," *L.J.*, 850 F.3d at 1004 (quoting 34 C.F.R. § 300.39(a)(1)), and includes "instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings" and "instruction in physical education," 20 U.S.C. § 1401(29).  Regulations further

United States District Court
Northern District of California

define "[s]pecially designed instruction" to mean:

> *adapting*, as appropriate to the needs of an eligible child under this part, *the content, methodology, or delivery of instruction—*
>
> (i) To address the unique needs of the child that result from the child's disability; and
>
> (ii) To ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public agency that apply to all children.

34 C.F.R. § 300.39(b)(3) (emphasis added).

"Related services" is defined by regulation to mean:

> transportation and such developmental, corrective, and other supportive services as are required to assist a child with a disability to benefit from special education, and includes speech-language pathology and audiology services, interpreting services, *psychological services*, physical and occupational therapy, recreation, including therapeutic recreation, early identification and assessment of disabilities in children, *counseling services*, including rehabilitation counseling, orientation and mobility services, and medical services for diagnostic or evaluation purposes.  Related services also include school health services and school nurse services, social work services in schools, and parent counseling and training.

34 C.F.R. § 300.34(a) (emphasis added); 20 U.S.C. § 1401(26).  If a child has a listed disability, "but only needs a related service and not special education, the child is not a child with a disability" under the IDEA, unless "consistent with § 300.39(a)(2), the related service required by the child is considered special education rather than a related service under State standards[.]"  34 C.F.R. § 300.8(a)(2)(i), (ii);[27] *see also McIntyre*, 976 F.3d at 914 (9th Cir. 2020) (concluding that exhaustion of claims under IDEA was not required where the accommodations plaintiff sought "cannot be construed as 'special education,' because they do not provide 'specially designed *instruction*'" and were not "'related services,' which are services a child needs 'to benefit from' special education."); Robert A. Garda, Jr., *Untangling Eligibility Requirements under the Individuals with Disabilities Education Act*, 60 Mo. L. Rev. 441, 486-87 (2004) (footnotes

---

[27] Section 300.39(a)(2) provides that "[s]pecial education" includes "[s]peech-language pathology services, or any other related service, if the service is considered special education rather than a related service under State standards," as well as  "travel training," and "vocational education." 34 C.F.R. § 300.39(a)(2).

1   omitted) ("'Special education' is a term of art, with a limited meaning, and not all services

2   provided by schools to disabled students are special education.  A child with Attention Deficit

3   Disorder ("ADD") may need preferential seating and the use of a word processor, but not special

4   education.").

5        In California, "special education" is defined "in accordance with [20 U.S.C. § 1401(29)] to

6   mean "specially designed instruction, at no cost to the parent, to meet the unique needs of

7   individuals with exceptional needs, including instruction conducted in the classroom, in the home,

8   in hospitals and institutions, and other settings, and instruction in physical education." Cal. Educ.

9   Code § 56031(a).  Additionally, California law defines "designated instruction and services" to

10  mean "'related services' as that term is defined in [20 U.S.C. § 1401(26) and 34 C.F.R.

11  § 300.34]." *Id*. § 56363(a).  The term "related services" means "transportation, and such

12  developmental, corrective, and other supportive services . . . as may be required to assist an

13  individual with exceptional needs to benefit from special education," and includes "psychological

14  services," "counseling services," "[i]nstruction in the home or hospital," "[c]ounseling and

15  guidance services, including rehabilitation counseling," "[p]sychological services other than

16  assessment and development of the individualized education program," and "[p]arent counseling

17  and training." *Id*. § 56363(a), (b).

18       A student's eligibility under the IDEA "should be assessed in terms of its appropriateness

19  at the time of the child's evaluation and not from the perspective of a later time with the benefit of

20  hindsight." *L.J.*, 850 F.3d at 1004 (citing *Adams*, 195 F.3d at 1149).  When making this

21  assessment, courts "employ what is termed the 'snapshot' rule that instructs the court to judge the

22  appropriateness of the determination on the basis of the information reasonably available to the

23  parties at the time of the IEP meeting." *Id*.  An eligibility decision is judged "on the basis of

24  whether it took the relevant information into account, not on whether or not it worked." *Id*.

25       **1.    Disability**

26       Although the ALJ generally described three categories at issue for eligibility under the

27  IDEA—emotional disturbance ("ED"), other health impairment ("OHI") and specific learning

28  disability ("SLD")—he did not expressly address whether N.N. meets the criteria for a disability

under any of those three categories.  *See* AR 1087-90.  Plaintiffs argue that N.N. had conditions that met the criteria for ED, OHI and SLD; the District maintains that N.N. did not meet the criteria under any category.  As discussed above, a student need only have a condition that satisfies one of the ED, OHI, or SLD categories.

The Court finds no serious dispute that N.N.'s conditions fall within at least the OHI and SLD categories.  With respect to the OHI[28] category, Dr. Nutter acknowledged N.N.'s diagnoses of major depressive disorder and anxiety; noted that N.N. "exhibit[s] some weakness" with attention and underdeveloped executive functions; and stated that "[t]his constellation of emotion and neurocognitive weaknesses can impact [N.N.]'s alertness over time."  AR 352.  As for the SLD[29] category, Dr. Nutter found that N.N. has an attention processing disorder and "a relative weakness in the area of reading," with a significant discrepancy between her ability and achievement in reading comprehension.  AR 353; *see also L.J.*, 850 F.3d at 1004 (concluding that

---

[28] An OHI is defined as:

> having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment, that—
>
> (i) Is due to chronic or acute health problems such as asthma, attention deficit disorder or attention deficit hyperactivity disorder, diabetes, epilepsy, a heart condition, hemophilia, lead poisoning, leukemia, nephritis, rheumatic fever, sickle cell anemia, and Tourette syndrome; and
>
> (ii) Adversely affects a child's educational performance.

34 C.F.R. § 300.8(c)(9).

[29] An SLD is generally defined to mean:

> a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or to do mathematical calculations, including conditions such as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia.

34 C.F.R. § 300.8(c)(10)(i).  An SLD "does not include learning problems that are primarily the result of visual, hearing, or motor disabilities, of intellectual disability, of emotional disturbance, or of environmental, cultural, or economic disadvantage."  *Id*. § 300.8(c)(10)(ii).

student "has a "'specific learning disability' because he has exhibited a severe discrepancy between his intellectual ability and his achievement.") (quoting 34 C.F.R. § 300.8(c)(10)).

As for the ED[30] category, the Court finds that the preponderance of the evidence demonstrates that N.N. also had conditions that fall within this category.  Dr. Nutter recognized that N.N. "has a history of experiencing a general pervasive mood of unhappiness or depression" and that N.N. had experienced depressive symptoms since at least May 2017.  AR 339, 352.  By that time, N.N. had "episodes of extreme sadness and thoughts of suicide" and used marijuana and alcohol to dull those feelings.  *See* AR 339.  Although Dr. Nutter found that N.N. experienced "a change in her mood" at the end of May 2018 (AR 352) and did not present as unhappy or depressed at the time of her assessment, other evidence in the record indicates that N.N. remained in an emotionally fragile state.  In particular, at the time of N.N.'s August 2018 discharge from Second Nature, Dr. Schueler noted that while N.N. had made progress at the program, Dr. Schueler remained concerned about N.N.'s risk of relapse regarding depressive symptoms, defiant behaviors, and substance abuse.  AR 315.

---

[30] An ED is defined as:

> a condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree that adversely affects a child's educational performance:
>
> (A) An inability to learn that cannot be explained by intellectual, sensory, or health factors.
>
> (B) An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.
>
> (C) Inappropriate types of behavior or feelings under normal circumstances.
>
> (D) A general pervasive mood of unhappiness or depression.
>
> (E) A tendency to develop physical symptoms or fears associated with personal or school problems

34 C.F.R. § 300.8(c)(4)(i).  ED includes schizophrenia, but "does not apply to children who are socially maladjusted, unless it is determined that they have an emotional disturbance under paragraph (c)(4)(i) of this section."  *Id*. § 300.8(c)(4)(ii).

United States District Court
Northern District of California

United States District Court
Northern District of California

### 2.    Need for special education and related services

Having a disability under 20 U.S.C. § 1401(3)(A)(ii) that impacts educational performance is necessary, but not sufficient to establish IDEA eligibility.  As noted above, a "child with a disability" is someone who, by reason of such disability, "needs special education and related services."  20 U.S.C. § 1401(3)(A)(ii).  Plaintiffs do not appear to dispute that a need for related services, alone, does not provide a basis for IDEA eligibility.  *See* 34 C.F.R. § 300.8(a)(2)((i); Dkt. No. 61 at 12-13.  The primary point of contention is whether the services N.N. received at Explorations constitute special education necessary for N.N. to access her education at TFHS, or whether they only were related services.  *See* 34 C.F.R. § 300.104 (providing that "placement in a public or private residential program" is required if "necessary to provide special education and related services to a child with a disability[.]").

Relying on *L.J. v. Pittsburgh Unified Sch. Dist.*, 850 F.3d 996 (9th Cir. 2017), plaintiffs argue that the services N.N. received at Explorations constitute special education.  In *L.J.,* the district court found that L.J. was disabled under three categories defined by the IDEA, but nonetheless concluded that he was not eligible for special education because of his satisfactory performance in general education classes.  *Id.* at 999.  The Ninth Circuit reversed, finding that the school "had already been providing L.J. with special services, including counseling, one-on-one assistance, and instructional accommodations" that "were in fact special education services tailored to L.J.'s situation."  *Id.* at 999, 1005.  In reaching that conclusion, the Ninth Circuit distinguished between general education, which "is provided to non-disabled children in the classroom," and special education, which "is 'specially designed instruction' to meet the unique needs of a child with a disability."  *Id.* at 1004 (quoting 34 C.F.R. § 300.39(a)(1)).  Many of the services the school provided to L.J. were not available to general education students—including one-on-one assistance from a paraeducator specially trained to work with special education students; group, individual and family therapy; educationally-related mental health assessments (which the school admitted were offered only to special education students); and extensive clinical interventions by a school behavior specialist who designed a 9-hour training session for L.J.'s paraeducator, as well as specific study plans that "adapt[ed] the method and delivery of L.J.'s

instruction, and strategies to promote a structured environment and reinforce positive behavior." *Id*. at 1005.

Plaintiffs argue that like L.J., N.N. received "specially-designed services at Explorations," including "academic instructional support, executive functioning skills, and individual, group, and family counseling services." Dkt. No. 55 at 17. Specifically, plaintiffs argue that Ms. Johnston provided what, they contend, is special education tailored to N.N.'s unique needs. *See id*. Plaintiffs broadly contend that all the "mental health services N.N. received at Second Nature and Explorations, were specially-designed for her, provided by qualified professionals, and necessary to receive educational benefit." Dkt. No. 55 at 18. However, they acknowledge that the individual and group therapy N.N. received at Explorations are "related services." *Id.* The question, then, is whether Ms. Johnston's support services constitute "special education."

As noted above, "special education" is "[s]pecially designed *instruction*" that "adapt[s], as appropriate to the needs of an eligible child under this part, the *content, methodology, or delivery of instruction*[.]" 34 C.F.R. § 300.39(b)(3) (emphasis added). Ms. Johnston supervised the Explorations study hall, provided after-school tutoring, helped N.N. create weekly study plans and yearly academic goals, and assisted N.N. with reading and with editing her written work. Much of what she did consisted of making sure that N.N. organized and used her time wisely, and plaintiffs contend that Ms. Johnston's support assisted N.N. with executive functioning skills necessary for N.N. to be successful in school. However, unlike *L.J.*, nothing in the record suggests that Ms. Johnston provided instruction that adapted the content, methodology, or delivery of N.N.'s general education curriculum.

For example, Ms. Johnston's weekly reports indicate that in supervising the Explorations study hall, she primarily monitored whether N.N. fulfilled her requisite study hall hours, used her study time productively, and kept up with her schoolwork. *See* AR 399-429. If N.N. fell behind on her schoolwork, she was required to spend additional time in study hall until she got caught up. *See, e.g.,* AR 401. Similarly, N.N.'s weekly study plans during her junior year included goals such as "Study for Chem final and finish English 2 semester 1 work", with associated tasks "1) Finish daily homework first, 2) Quizlets for Chem final, 3) ConnectED practices for Chem and

4) Work on English 2 paragraph by paragraph," and goals of "Daily homework, English Final Essay, Study for tests," with associated tasks "1) Work on homework first, 2) 15-20 minutes studying for tests daily, 3) Write English essay and 4) Review essay."  AR 405, 406.  Other study plans during N.N.'s senior year note goals of "Stay up to date with all schoolwork and to be prepared for any quiz/tests," with associated tasks "1. Study 30-40 min. for math test, 2. Complete any HW [homework], 3. Get a start on college looking, 4. Sleep by 10 pm daily" (AR 424), as well as goals of "Turn in any late/missing work and prep for college," with associated tasks "1. Finish & turn in late math homework, 2. Finish up Beowulf Rough draft, 3. Sign up for ACT [American College Test], 4. Sign up for FAFSA [Free Application for Federal Student Aid]" (AR 425).

Ms. Johnston did note reading and writing as specific areas of weakness for N.N.  *See* AR 474.  While Ms. Johnston contacted N.N.'s English teacher to check on N.N.'s progress (AR 1916:3-8, 10-13; 1917:3-7, 8-15, 21-24; 1918:20-1919:3), there is no indication that Ms. Johnston or anyone else provided instruction to N.N. that adapted the content, methodology, or delivery of instruction in that class.  Aside from working with N.N. on her weekly study plans, Ms. Johnston set a goal for N.N. to read four books on subjects of interest to N.N.  AR 474; 1913:9-14.  She also helped N.N. edit her school essays by providing comments to N.N., who received the comments and edited her work independently.  AR 1918:5-13.

Nothing in Ms. Johnston's testimony suggests that the support she provided constituted "[s]pecially designed instruction."  34 C.F.R. § 300.39(b)(3).  The Court agrees with the District that the support Ms. Johnston provided to N.N. resembles the kind of support a parent provides for a child at home.  Indeed, in distinguishing the support she provided at Explorations and the support that a parent might provide at home, Ms. Johnston noted only that she could provide a structured study environment with a level of professional detachment that parents may not be able to provide due to time or financial constraints or because of strained relationships with their children.  AR 2055:16-2056:18; 2059:25-2060:2; 2061:8-25.  Additionally, Ms. Johnston did not refer N.N. for special education because N.N. had a 504 plan at TFHS that Ms. Johnston believed was sufficient.  AR 1948:16-22.  Plaintiffs point out that Ms. Hardy testified that executive

65

1    functioning instruction could be special education if it is provided by a special education teacher

2    and is "uniquely adapted to the learning profile of that one student." AR 2405:10-20. They

3    further argue that Ms. Johnston's support falls within Dr. Nutter's own description of an

4    "intervention." Here, they note that Dr. Nutter generally agreed that an "intervention" could

5    address executive functioning needs, and is "something that is not provided to the general class or

6    the general group . . . something specialized and specific with a determined goal that is linked to

7    an identified deficit." AR 1737:5-10. However, Dr. Nutter also testified that an "intervention"

8    requires "an instructional component." AR 1739:23. Here, Ms. Johnston's weekly reports reflect

9    that she assisted N.N. after school in keeping track of her assignments, organizing her approach to

10   homework and other tasks, studying every school night in study hall, encouraging her to read

11   more, and providing comments for N.N. to use in independently editing her written work.

12       For the reasons discussed above, plaintiffs have not demonstrated that Ms. Johnston's

13   support services constitute "[s]pecially designed instruction" as defined by 34 C.F.R.

14   § 300.39(a)(1).

15       Plaintiffs nonetheless maintain that in finding in favor of the District, the ALJ focused too

16   narrowly on N.N.'s academic success at TFHS and Dr. Nutter's observations and test results

17   suggesting that N.N. was no longer sad or depressed, and failed to consider the broader context of

18   N.N.'s mental health issues and treatment. Plaintiffs argue that notwithstanding N.N.'s positive

19   performance at TFHS, consideration should have been given to the opinions and reports of Dr.

20   Schueler, Mr. Boudousquie, Dr. Medina, and Dr. Solomon, and greater weight assigned to their

21   testimony and opinions than to Dr. Nutter's opinion that N.N. was not eligible for special

22   education. Here, plaintiffs point out that Dr. Schueler expressed concern about N.N.'s risk of

23   relapse following her discharge from Second Nature and recommended placement in a residential

24   program. AR 313, 315. Additionally, they note Mr. Boudousquie's testimony that N.N. masked

25   her symptoms, which he observed only after spending some time with her. AR 1988:9-11;

26   1990:8-10, 20-24. N.N.'s ongoing mental health needs, plaintiffs contend, are further

27   substantiated by Dr. Medina's February 2019 report, which documents Dr. Medina's diagnoses,

28   including ADHD, Persistent Depressive Disorder (Dysthmia), a Parent-Child Relational Problem,

United States District Court
Northern District of California

with a need to rule out Mixed Expressive-Receptive Language Disorder or Language Processing Disorder; and a Specific Learning Disorder with Impairment in Mathematics.  AR 453.  Finally, plaintiffs note that Dr. Medina's opinion regarding N.N.'s mental health impairments are supported by Dr. Solomon, who testified that serious symptoms of depression and anxiety do not simply resolve, and that as of September 2018 N.N. was "on the route to recovery," but could not be expected to have internalized new habits and coping skills.  Dkt. No. 57 at 54:2-19.  All of this evidence, plaintiffs argue, demonstrates that as of the September 18, 2018 IEP meeting and even as of Dr. Medina's February 2019 assessment, N.N. continued to experience a general pervasive mood of unhappiness or depression to a marked degree.  *See* Dkt. No. 55 at 21; Dkt. No. 61 at 14-15.

The purpose of Dr. Nutter's psychoeducational assessment, however, was not merely to ascertain whether N.N. had a mental disorder or impairment, but to determine whether she had a disability as defined by the IDEA "*and* by reason thereof, need[ed] special education and related services."  20 U.S.C. § 1401(3)(A)(i), (ii); *see also* Dkt. No. 57 at 62:5-63:11.  There is no contention that Dr. Nutter was not qualified to do so.  As described by Dr. Schueler, Second Nature focuses on clinical, rather than educational, support.  *See* AR 313 ("Second Nature is a licensed adolescent treatment program that utilizes the experiential opportunities of a wilderness setting with a clinically focused intervention.").  As noted above, although N.N. apparently earned several school credits while at Second Nature (AR 1025, 2445:25-2446:5), there is no evidence indicating what educational services, if any, N.N. received while she was at that program.  Similarly, Mr. Boudousquie generally did not deal with matters concerning N.N.'s academic performance.  AR 1993:4-9, 16-22; 2006:23-2007:17.  Without deferring to the ALJ's findings, the Court finds no error in his decision to discount the weight given to Dr. Medina's report, given the lack of educational context in her report and lack of evidence regarding Dr. Medina's experience in education or evaluating a student for IDEA eligibility.  *See* AR 434-59; 2368:13-2369:1.  While Dr. Solomon testified at the July 2021 evidentiary hearing to her experience in performing independent psychoeducational evaluations, she had not assessed N.N.  In fact, as of the administrative hearing, Dr. Solomon had not spoken with T.T. or anyone who served N.N.

1    AR 2339:8-17.[31]

2         Plaintiffs' reliance on an OAH decision, *Parent v. Santa Monica-Malibu Unified Sch. Dist.*

3    ("*Santa Monica*"), OAH Case No. 2018050306 (Nov. 30, 2018), is misplaced.  In *Santa Monica*,

4    the ALJ concluded that the school denied the student a FAPE and rejected the school's contention

5    that school-based counseling, as opposed to placement in a residential treatment facility, would

6    have been sufficient to meet the student's needs.  The ALJ explained that the school narrowly

7    focused on "certain test scores and interviews to determine Student's mental health issues were not

8    significant, rather than consider the entire picture of what was happening to Student," and

9    "discounted or ignored Student's behaviors across domains," including her limited academic

10   progress and risky and inappropriate behaviors in other facilities and settings.  Dkt. No. 56-1

11   (Plaintiff's Request for Judicial Notice, Ex. 1 at 57, 60).  In particular, the ALJ noted that "[f]or

12   [the] most part, Student was not attending public school," and "was in a residential setting where

13   her academics and behaviors were subject to a controlled environment, and she was receiving

14   intensive individual, group, and family therapy provided by a clinical therapist, not a school

15   psychologist."  *Id.* at 58, 60.

16        Here, by contrast, N.N. received a regular education at TFHS; Explorations did not provide

17   or control her academic instruction.  While N.N. also received services at Explorations, for the

18   reasons discussed above, plaintiffs have not established that those services constitute special

19   education, such that N.N. is eligible as a "child with a disability" under the IDEA.  *See generally*

20   *D.A. v. Meridian Joint Sch. Dist. No. 2*, No. 1:12-cv-00426-CWD, 2014 WL 43639, at *13-15 (D.

21   Idaho Jan. 6, 2014) (concluding that student with high-functioning autism did not need special

22   education to benefit from his education where his condition "appears to necessitate related

23   services far more than it does special education."); *R.C. v. York Sch. Dep't*, No. 07-177-P-S, 2008

24   WL 4427194 (D. Me. Sept. 25, 2008) (concluding that student was not eligible under the IDEA,

25   where student succeeded in school despite serious mental health issues, including major

26

27   _____
     [31] At the July 2021 evidentiary hearing, Dr. Solomon stated that she interviewed N.N. over the
28   phone shortly after the administrative hearing.  That interview was outside the permissible scope
     of Dr. Solomon's supplemental testimony.  *See* Dkt. No. 57 at 11-12.

depression, requiring treatment), *report and recommendation adopted* 2008 WL 5135239 (D. Me. Dec. 5, 2008).

Accordingly, plaintiffs have not met their burden to show that the District denied N.N. a FAPE by failing to identify her as a student eligible for special education and offering an IEP for the school years 2018-2019 and 2019-2020.

### F.        Whether T.T. is Entitled to Reimbursement

Plaintiffs seek reimbursement of costs, subject to proof, for (1) private mental health services provided by CHC in the amount of $3,000; (2) Dr. Medina's psychological evaluation in the amount of $4,662; (3) placement at Second Nature in the amount of $46,309.52; (4) placement at Explorations in the amount of $148,121.60; (5) transportation expenses related to N.N.'s placements and family therapy visits in the amount of $10,922.98; and (6) an award of costs and reasonable attorneys' fees and expenses, subject to proof.  Dkt. No. 55 at 25.

The IDEA authorizes courts to grant "such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(2)(C)(3), and "confers broad discretion on the court" to determine the appropriate remedy where a FAPE has not been provided.  *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985).  "[E]quitable considerations are relevant in fashioning relief."  *Id*. at 374.  Parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of the school, do so at their own financial risk.  *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15 (1993).  "They are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the [IDEA]."  *Id*.  "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required."  *Id*. at 16.  "Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable."  *Id*.

In their briefs, the parties addressed plaintiffs' request for reimbursement largely on the assumption that the ALJ's decision would be affirmed or reversed entirely, without accounting for the possibility that the Court might affirm his decision in part.  Accordingly, the Court requires

further briefing on the issue of what remedy, if any, is appropriate in view of the Court's

determination that the District denied N.N. a FAPE in the 2017-2018 school year by waiting too

long to conduct an assessment, but did not deny N.N. a FAPE in the 2018-2019 and 2019-2020

school years.

## VI.    CONCLUSION

Based on the foregoing, the ALJ's decision is affirmed in part and reversed in part.  The

Court defers its ruling on plaintiffs' request for reimbursement and for attorneys' fees and costs,

pending further briefing, consistent with this order.

By **August 12, 2022**, the parties shall submit a proposed briefing schedule for briefing

addressing what relief, if any, may be appropriate for the Court to award to plaintiffs.  The further

briefing shall not be used for any arguments for reconsideration.  Unless otherwise ordered, there

will be no further supplementation of the evidentiary record and the matter will be deemed

submitted without oral argument upon the submission of the parties' respective supplemental

briefs.  The Court grants the parties' July 15, 2022 joint request to continue deadlines as follows:

Last day for hearing on dispositive motions:  March 21, 2023

Final Pretrial Conference:   July 19, 2023, 10:00 a.m.

Jury Trial (6 days):   August 2-4, 7-9, 2023, 9:00 a.m.

**IT IS SO ORDERED.**

Dated: August 4, 2022

VIRGINIA K. DEMARCHI
United States Magistrate Judge