UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

N. N., et al.,

          Plaintiffs,

    v.

MOUNTAIN VIEW-LOS ALTOS UNION HIGH SCHOOL DISTRICT,

          Defendant.

Case No. 20-cv-08010-VKD

**ORDER RE SUPPLEMENTAL IDEA BRIEFING RE REMEDIES**

Re: Dkt. Nos. 72-75

Plaintiffs N.N. and her mother T.T. filed this action against the Mountain View-Los Altos Union High School District ("District") seeking judicial review of an administrative decision under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq*.[1] Plaintiffs contend that the District failed to identify N.N. as a student eligible for special education services in her sophomore year in high school, leading to her enrollment in a private residential program in Montana, where she attended a local public high school for her junior and senior years. Plaintiffs claim that the District denied N.N. a free appropriate public education ("FAPE") for each of the three school years at issue, 2017-2018, 2018-2019, and 2019-2020. They seek reimbursement of expenses related to her private placement and other services, as well as their attorneys' fees and costs.

In the administrative proceedings, an administrative law judge ("ALJ") concluded that the District did not deny N.N. a FAPE because plaintiffs did not meet their burden to show that N.N.

---

[1] Plaintiffs also assert claims for violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §§ 749, *et seq*., and for violation of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12132, *et seq*. Those claims are not before the Court on the present briefing.

was eligible for special education. AR[2] 1068-96. The Court reversed the ALJ's decision in part and affirmed it in part. Dkt. No. 69.[3] Specifically, the Court found that the District denied N.N. a FAPE during the 2017-2018 school year, when N.N. was a sophomore at Los Altos High School ("LAHS"), by delaying a special education assessment. However, the Court concluded that the District did not deny N.N. a FAPE during the 2018-2019 and 2019-2020 school years because the evidence demonstrated that she did not need special education services. The parties were directed to submit further briefing addressing what relief, if any, appropriately may be awarded to plaintiffs. *Id.*

The parties have submitted their supplemental briefs. Dkt. Nos. 72-75. The matter is deemed suitable for determination without oral argument. Civil L.R. 7-1(b). Upon consideration of the moving and responding papers, the Court denies plaintiffs' request for reimbursement of expenses and defers ruling on an award of attorney's fees and costs.[4]

The IDEA authorizes courts to grant "such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(2)(C)(3), and "confers broad discretion on the court" to determine the appropriate remedy where a FAPE has not been provided, *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985); *see also Florence Cnty. Sch. Dist. v. Carter*, 510 U.S. 7, 15-16 (1993) ("[O]nce a court holds that the public placement violated IDEA, it is authorized to grant such relief as the court determines is appropriate.") (internal quotations and citation omitted). The IDEA does not provide for the recovery of compensatory damages. *See C.O. v. Portland Public Schs.*, 679 F.3d 1162, 1166 (9th Cir. 2012) ("We have repeatedly held that the IDEA creates a 'comprehensive enforcement scheme' in which compensatory damages

---

[2] "AR" refers to the administrative record plaintiffs lodged with the Court. *See* Dkt. Nos. 31, 35, 51.

[3] The parties are familiar with the particular facts of this case, which are recounted in detail in the Court's August 4, 2022 order and will not be repeated here, except as necessary in the discussion below.

[4] Plaintiffs intend to seek an award of reasonable attorneys' fees and costs "according to proof." *See* Dkt. No. 72 at 10. The District contends that it is premature to decide whether any such award is warranted (*see* Dkt. No. 73 at 9-10), and neither side has sufficiently briefed the matter so as to enable the Court to make a proper determination regarding such an award at this time.

play no part."). However, the IDEA allows for an award of "[c]ompensatory education," which "is an equitable remedy that seeks to make up for educational services the child should have received in the first place, and aims to place disabled children in the same position they would have occupied but for the school district's violations of IDEA." *R.P. v. Prescott Unified Sch. Dist.*, 631 F.3d 1117, 1125 (9th Cir. 2011). The IDEA also allows for "retroactive reimbursement," which requires a school district "to belatedly pay expenses that it should have paid all along and would have borne in the first instance had it developed a proper [individual education program]." *Burlington*, 471 U.S. at 370-71. "[E]quitable considerations are relevant in fashioning relief." *Id.* at 374. "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable level of reimbursement that should be required." *Carter*, 510 U.S. at 16. "Total reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." *Id.*

Parents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of the school, do so at their own financial risk. *Id.* at 15. "They are entitled to reimbursement *only* if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the [IDEA]." *Id.*; *see also Ashland Sch. Dist. v. R.J.*, 588 F.3d 1004, 1009 (9th Cir. 2009) (courts may grant reimbursement "only when a school district fails to provide a FAPE *and* the private-school placement is appropriate.") (internal quotations and citation omitted). "The latter requirement is essential to ensuring that reimbursement awards are granted only when such relief furthers the purposes of the [IDEA]." *Ashland Sch. Dist.* 588 F.3d at 1009 (internal quotations and citation omitted).

To be "proper" within the meaning of the IDEA, a private placement need not comply with IDEA requirements for a FAPE, or with state educational standards. *Carter*, 510 U.S. at 13-14. Moreover, "parents need not show that a private placement furnishes every special service necessary to maximize their child's potential." *C.B. v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011) (citation and emphasis omitted). Rather, parents "need only demonstrate that the placement provides educational instruction specially designed to meet the [child's] unique needs . . . supported by such services as are necessary to permit the child to

3

benefit from instruction." *Id.* (citation omitted).

In the present case, the Court found that the District denied N.N. a FAPE during the 2017-2018 school year by delaying a special education assessment. The parties dispute the propriety of plaintiffs' requested reimbursement for services and placements, as well as associated transportation expenses, incurred across all three school years—namely, costs of mental health services provided by the Children's Health Council ("CHC") in Palo Alto, California in March-April 2018; N.N.'s placement at the Second Nature Wilderness Program ("Second Nature") in Utah over the summer of 2018; and her placement at the Explorations residential program in Montana during her junior and senior years (2018-2019 and 2019-2020, respectively). Additionally, the District maintains that reimbursement is not appropriate because the services and programs in question primarily addressed N.N.'s mental health issues, rather than her educational needs.

The Court agrees with the District that there should be no reimbursement of expenses incurred in the academic years for which the Court found no violation of the IDEA. Plaintiffs posit that the delay in assessing N.N. during her sophomore year impacted the trajectory of the remainder of her high school career. However, they have not convincingly demonstrated that reimbursement for expenses incurred during the school years 2018-2019 and 2019-2020 furthers the purposes of the IDEA, particularly in view of the Court's finding that N.N. did not need special education services.

Moreover, the Court is not persuaded that the private services and placements for which plaintiffs seek reimbursement provided "*educational instruction* specially designed to meet [N.N.'s] unique needs . . . supported by such services as are necessary to permit [her] to benefit from instruction." *C.B.*, 635 F.3d at 1159 (emphasis added). The services T.T. obtained for N.N. addressed only her mental health needs, and did not support the provision of any specially designed educational instruction. *See id.* With respect to CHC, N.N. voluntarily chose to attend the CHC intensive outpatient program, rather than go to the continuation school offered by the District. *See* Dkt. No. 69 at 7; AR 1823:17-21, 1824:2-15, 2119:22-25, 2120:10-14, 2122:4-8. There is no evidence that the CHC program included any educational component. Plaintiffs

acknowledge that the primary focus of the outpatient program was to stabilize N.N.'s mental health and "may be determined to be more 'medical' in nature[.]" Dkt. No. 75 at 4. Indeed, N.N.'s CHC therapist Jennifer Leydecker stated that CHC's priority is to stabilize a child's mental health, and CHC refers families back to the school for "school-based things[.]" AR 1475:21-1476:7.

Plaintiffs nevertheless maintain that the Second Nature and Explorations programs were necessary for N.N.'s educational progress. "When confronted with the necessity for residential placement where the need involves a mixture of educational and noneducational concerns, the courts have struggled to develop tests to determine when the special education system is responsible for the costs of the placement." *Cnty. of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458, 1468 (9th Cir. 1996). The Ninth Circuit has identified three possible tests for when to impose responsibility on the District for residential placements: "(1) where the placement is 'supportive' of the pupil's education; (2) where medical, social or emotional problems that require residential placement are intertwined with educational problems; and (3) when the placement is primarily to aid the student to benefit from special education." *Id*. (citing *Clovis Unified Sch. Dist. v. Cal. Office of Admin. Hearings*, 903 F.2d 635, 643 (9th Cir. 1990)). Because "[a]ll medical services are arguably 'supportive'" of a disabled child's education, "mere 'supportiveness' is too broad a criterion to be the test for whether a specific service is necessary under the [IDEA] to assist a child to benefit from special education." *Clovis*, 903 F.2d at 643. Additionally, the Ninth Circuit has rejected the proposition that schools are responsible for the entire cost of a placement simply because issues that require hospitalization create or are intertwined with educational problems. *Id*. Instead, courts must focus their analysis "on whether [the student's] placement may be considered necessary for educational purposes, or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process." *Id*.

With respect to the Second Nature program, the weight of the evidence demonstrates that N.N.'s placement primarily was a response to her mental health issues, not her educational needs. T.T. requested a special education assessment on May 1, 2018. By May 15, 2018, she had

enrolled N.N. in Second Nature; and N.N. left California for that program two days later on May 17, 2018. AR 287, 289, 295, 2434:16-23. When the District subsequently tried to schedule an assessment, T.T. requested that testing be conducted in Utah, noting that for N.N.'s "safety," she was not able to return to California for testing. AR 962. As described by N.N.'s Second Nature treating psychologist Dr. Cody Schueler, Second Nature focuses on clinical, rather than educational, support. *See* AR 313 ("Second Nature is a licensed adolescent treatment program that utilizes the experiential opportunities of a wilderness setting with a clinically focused intervention."). Although N.N. earned several school credits while at Second Nature (*see* Dkt. No. 69 at 10; AR 1025, 2445:25-2446:5), there is no evidence indicating what educational services or instruction, if any, she received while she was at that program.

Similarly, with respect to Explorations, the evidence demonstrates that the focus of N.N.'s placement primarily was to address her mental health issues. *See Ashland*, 588 F.3d at 1010 (the court's "analysis must focus on whether [the residential] placement may be considered necessary for educational purposes.") (citing *Clovis Unified Sch. Dist.*, 903 F.3d at 643). When N.N. was discharged from Second Nature, Dr. Schueler noted that "[s]chool accommodations and a more individualized instruction plan will be important for academic success," but recommended residential treatment principally out of a concern for N.N.'s risk of relapse in depressive symptoms, defiant behavior, and substance abuse, and to give N.N. an opportunity to "practice and internalize the tools she learned at Second Nature." *See* Dkt. No. 69 at 12-13; AR 315.

As noted in the Court's prior order, Explorations is not licensed as a residential treatment center, nor is it licensed as a school. It does not have a special education teacher on its staff, and does not provide a school as part of its program. *See* Dkt. No. 69 at 14; AR 2231:25-2232:5; 2233:5-13. While those facts are not necessarily dispositive of the question whether reimbursement may be appropriate, Explorations founder and director, Penny James, indicated that the program's primary goal is to ease a student's transition back to a less restrictive setting, by providing the student with the opportunity "to practice in normative life things for a portion of their day" and "a therapeutic environment, where they can process [those experiences], receive support, and develop plans." AR 2239:1-16. To that end, all Explorations participants, including

N.N., were required to attend weekly group therapy sessions that typically last around two hours. *See* AR 1852:13-17; 1864:4-6; 1975:1-18; 2180:10-11. Additionally, at least once per week, N.N. was required to attend individual therapy sessions that also included family therapy/therapeutic phone calls with parents. *See* AR 1976:16-25; 2180:11-16. N.N.'s therapy at Explorations focused on her depression and anger, her interaction with peers, and her family relationships, as well as self-advocacy skills, post-high school plans, and developing skills to efficiently and effectively work toward goals. *See* AR 1853:9-1854:9; 1977:3-9; 1991:17-1992:5.

While N.N. was required to attend the Explorations study hall several times per week and to meet weekly with Ms. Johnston, who supervised the study hall, N.N. received her education at a local public high school, where she attended regular education classes during the day without Explorations staff present. *See* AR 2179:16-17, 24-25; 2180:3-5; 2216:4-9. Moreover, Explorations staff that provided N.N.'s therapeutic services generally did not address her academic affairs. For example, N.N.'s therapist, Bruce Boudousquie, testified that he did not discuss N.N. with the local public high school staff and generally left academic matters for Ms. James or Ms. Johnston to address. AR 1993:4-9; AR 2006:33-2007:17; 2007:23-2008:1. Similarly, N.N.'s therapist Amy Henderson testified that she did not regularly consult or speak with Ms. Johnston about N.N.'s needs in school, except "just briefly a couple of times," as "more of a check-in." AR 1857:3-13; 1873:10-18. And while Ms. Johnston recommended a speech pathology evaluation for N.N., she testified that she normally recommends such an evaluation for any student who demonstrates a reluctance to read, and Ms. Johnston did not follow up on that recommendation because it was "more of a therapeutic process" that was "outside of [her] purview." AR 474; 2037:13-18, 2040:3-6.

Plaintiffs maintain that, in evaluating the propriety of a private placement, the "educational instruction" component of the standard adopted by the Ninth Circuit in *C.B.* should not be construed narrowly. While it is true that reimbursement may be awarded for services and programs that are not strictly "academic," the cases on which plaintiffs principally rely are distinguishable. In *Union Sch. Dist. v. Smith*, the Ninth Circuit concluded that the parents were entitled to reimbursement for placement at a private counseling facility that did not provide special

education.  However, *Smith* turned on specific California statutes, applicable to three- to five-year old students, providing that such students "when appropriate, may be placed in a program that only provides [Designated Instruction and Services] without simultaneous special education." 15 F.3d 1519, 1527 (9th Cir. 1994).  In the *A.P.* decisions cited by plaintiffs, the district court permitted at least partial reimbursement for tuition at a private facility described as "a school which specializes in educating students with twice-exceptional profiles," as well as part of the costs for private "therapeutic counseling support services."  *See A.P. v. Pasadena Unified Sch. Dist.*, No. CV 19-7965-MWF (SSx), 2021 WL 810416, at *3, *12 (C.D. Cal. Jan. 26, 2021); *see also A.P. v. Pasadena Unified Sch. Dist.*, No. CV 19-7965-MWF (SSx), 2021 WL 5249658 (C.D. Cal. Aug. 24, 2021).  Although the private counseling services the student received were not delivered as part of her private educational placement, A.P's parents indicated that those services were necessary to support her placement at the private school, *A.P.*, 2021 WL 810416 at *12; and the district court concluded that the counseling costs "would not have been incurred by Parents had the District timely assessed and offered these services to Plaintiff" as part of an IEP, *A.P.,* 2021 WL 5249658, at *4.  Other cases cited by plaintiffs similarly concerned reimbursement for private placements that included some educational component.  *See, e.g., Seattle Sch. Dist. No. 1 v. B.S.*, 82 F.3d 1493, 1502 (9th Cir. 1996) (affirming school district's responsibility for costs of student's placement at a private "accredited educational institution"), *abrogated in part on other grounds by Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56-58 (2005); *Dep't of Educ. v. L.S.*, No. 18-cv-00223 JAO-RT, 2019 WL 1421752, at *14 (D. Haw. Mar. 29, 2019) (finding that placement in a private "therapeutic day program" was appropriate for purposes of reimbursement under the IDEA, noting that while it "is not an academic institution, the program incorporated some academic subjects, including math, English, and science.").

The Ninth Circuit's decision in *County of San Diego v. Cal. Special Educ. Hearing Office*, 93 F.3d 1458 (9th Cir. 1996) does not compel a contrary conclusion.  The key issue in that case was not whether the school district's day program placement was reasonably calculated to provide the student with education benefit, but whether the services provided by that placement were sufficient to implement the student's IEP goals.  *Id*. at 1466-67.  The Ninth Circuit affirmed that

residential treatment was necessary for the student, who was hospitalized for "violent outbursts related to" her schoolwork; and, the Ninth Circuit noted that while she had "difficulties" that "are related to noneducational problems," the student's "primary problems are educationally related." *See id.* at 1462, 1468.

Here, by contrast, while there is evidence that N.N.'s mental health issues affected her learning (*see, e.g.,* AR 281), the weight of the evidence demonstrates that N.N.'s problems were not primarily educationally related and the services in question did not include any educational component. Both Second Nature and Explorations provided mental health therapy services, with no educational instruction. As discussed in the Court's prior order, during her junior and senior years, N.N. did well overall in her regular education program at the Montana public high school, with minimal resort to 504 accommodations that were virtually identical to the ones provided by LAHS. *See* Dkt. No. 69 at 24-31, 57-69. For these reasons, the expenses for which plaintiffs request reimbursement are not recoverable under the IDEA.

Accordingly, the Court denies plaintiffs' request for reimbursement.

**IT IS SO ORDERED.**

Dated: March 31, 2023

VIRGINIA K. DEMARCHI
United States Magistrate Judge